In re **OLYMPIA HOLDING CORPORATION, et al.,** Debtors.

Lloyd T. **WHITAKER,** Plaintiff– Appellant,

v.

**FRITO–LAY, INC.,** a Delaware corporation, Defendant– Appellee.

No. 93–3463.

United States Court of Appeals, Eleventh Circuit.

July 24, 1996.

Gardner F. Davis, Foley & Lardner, Jacksonville, FL, George E. Ridge, Kent Ridge & Crawford, Jacksonville, FL, Kim D. Mann, Shawn, Mann & Niedermayer, Washington, DC, Peter B. Friedman, Steven M. Pesner, Akin, Gump, Strauss, Hauer & Feld, LLP, New York City, for appellant.

Robert L. Cope, Grove, Jaskiewicz & Cobert, Washington, DC, for appellee.

James L. Ade, KoKo Head, Martin, Ade, Birchfield and Mickler, Jacksonville, FL, Richard D. Bickelman, Kurt Terwilliger, Deutsch, Williams, Brooks, Boston, MA, for amicus curiae GTE Corporation.

Mark A. Dickerson, Pleasant Hill, CA, for amicus curiae Continental American Corporation.

Theodore K. Kalick, ICC, Washington, D.C., for amicus curiae Interstate Commerce Commission.

Before TJOFLAT, Chief Judge, and BARKETT, Circuit Judge.*

TJOFLAT, Chief Judge:

During the times relevant to the controversy in this case, the Interstate Commerce Commission ("ICC") authorized motor common carriers to file tariffs, which indicated the rates the carrier would charge a shipper for transporting certain commodities from one location to another, without identifying the shipper by name.[1] Instead, the carriers were given the option of identifying the shipper by code. P*I*E Nationwide, Inc. ("P*I*E"), a now-bankrupt motor common carrier, employed this code option when filing its tariffs with the ICC. Its trustee in bankruptcy, appellant Lloyd T. Whitaker, contending that the practice of encoding shipper names violates the Interstate Commerce Act, and that such tariffs are therefore invalid, has instituted several adversary proceedings against shippers who were identified by code in P*I*E tariffs. Whitaker seeks to recover the "undercharge," that is, the difference between the discount rate actually billed to the shippers (based on the rates prescribed in the coded tariffs) and the full undiscounted rates, or "class rates." Class rates are rates that are applicable to

---

\* Senior Circuit Judge Lewis R. Morgan heard argument in this case but did not participate in this decision. This decision is rendered by quorum. 28 U.S.C. § 46(d).

1. A motor common carrier is "a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C. § 10102(15) (1994).

all shippers; tariffs containing these rates therefore do not identify the shippers in any manner.

The district court held that the trustee lacked standing to pursue a claim based on P*I*E's identification of Frito–Lay, Inc., in tariffs by code and thus dismissed the complaint in that case. *Whitaker v. Frito–Lay, Inc. (In re Olympia Holding Corp.)*, 160 B.R. 185 (M.D.Fla.1993). The trustee now appeals, presenting one question: May a trustee in bankruptcy for a motor common carrier assert undercharge claims against that carrier's shippers on the basis that the carrier's tariffs on file with the ICC are invalid because they identify the shipper by code rather than by name? We answer this question in the negative, and therefore affirm the district court's judgment on the ground that the trustee has failed to state a claim for relief.

In order to understand the nature of the controversy in this case, it is necessary first to comprehend the significance of the "filed rate doctrine," which we explain in part I. In part II, we recite the facts giving rise to this adversary proceeding. Finally, in part III, we examine the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044, and explain why that statute bars the trustee's claim.

I.

Until recently, motor common carriers were responsible for filing tariffs with the ICC that disclosed their transportation rates.[2] *See* 49 U.S.C. § 10762(a)(1) (1994).[3] This filing requirement, originally used only to regulate the railroad industry, *see* Interstate Commerce Act ("ICA"), ch. 104, 24 Stat. 379 (1887), was extended to reach the trucking industry with the modification of the ICA in 1935, *see* Motor Carrier Act of 1935, ch. 498, 49 Stat. 543. As opposed to motor contract carriers, whose rates were set out in continuing, individual agreements with their particular customers, *see* 49 U.S.C. § 10102(16), the rates for transportation by motor common carriers were governed by tariffs on file with the ICC.[4] Originally, these rates, known as "class rates," applied to any shipper who desired to move the particular type of commodity specified in a tariff over the particular routes covered by that tariff.[5]

**2.** Effective on January 1, 1996, the ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804, abolished the ICC, but transferred most of the Commission's functions to a new agency within the Department of Transportation called the Surface Transportation Board. *See* 49 U.S.C.A. § 702 (West 1996) (added by ICC Termination Act § 201, 109 Stat. at 932).

In its savings provisions, the ICC Termination Act provides that "[t]his Act shall not affect suits commenced before the date of the enactment of this Act.... In all such suits, proceeding shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this Act had not been enacted." § 204(c)(1), 109 Stat. at 942. For purposes of this appeal, then, we treat the provisions of the Interstate Commerce Act (principally subtitle IV of title 49 of the United States Code) as they existed prior to the enactment of the ICC Termination Act; we cite these provisions to the 1994 edition of the United States Code. We cite the current provisions of title 49 to the 1996 edition of the United States Code Annotated.

**3.** This section provided, in pertinent part, that "[a] motor common carrier ... shall publish and file with the Commission tariffs containing the rates for transportation it may provide under [subtitle IV of title 49 of the United States Code]. The Commission may prescribe the other infor-

mation that motor common carriers ... shall include in their tariffs."

The tariff filing requirement was eliminated for most forms of trucking transportation with the passage of the ICC Termination Act of 1995. *See* H.R.Conf.Rep. No. 104–422, 104th Cong., 1st Sess. 243, *reprinted in* 1995 U.S.C.C.A.N. 850, 928 (table). The requirement remains intact only in a limited number of situations, none of which are pertinent here. *See* 49 U.S.C.A. § 13702 (West 1996).

**4.** Because most filing requirements have been abolished, most transportation will now be provided under private agreements, and therefore the distinction between common and contract carriers is no longer meaningful. The terms "common carrier" and "motor common carrier" have therefore been deleted by the ICC Termination Act. *Compare* 49 U.S.C.A. § 13102 (West 1996) *with* 49 U.S.C. § 10102(4), (15).

**5.** In addition, rates for transportation were often set collectively by carriers through organizations known as "rate bureaus." *See* H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 27–28, *reprinted in* 1980 U.S.C.C.A.N. 2283, 2309–10. These organizations continue to enjoy antitrust immunity, *see* 49 U.S.C.A. § 13703(a)(6) (West 1996), and file the necessary tariffs applicable to their member carriers.

■ The filing requirement led to the development of what has become known as the "filed rate doctrine." This doctrine requires that a common carrier adhere to its rates on file with the ICC, irrespective of any rate it may have separately negotiated with a shipper. *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126–27, 110 S.Ct. 2759, 2765–66, 111 L.Ed.2d 94 (1990); 49 U.S.C. § 10761(a). Therefore, "[u]nless and until suspended or set aside, this [filed] rate is made, for all purposes, the legal rate, as between carrier and shipper." *Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922).

■ The primary purpose behind mandating the collection of filed rates is to prevent carriers from discriminating among shippers in the pricing of services.[6] *See, e.g., Maislin,* 497 U.S. at 126, 110 S.Ct. at 2766. The ICA contained an explicit prohibition on "unreasonable discrimination" by motor common carriers.[7] *See* 49 U.S.C. § 10741. The filed rate doctrine is designed to further this objective by foreclosing the possibility that carriers maintain one rate on file while either negotiating another (secret) lower rate with some shippers or providing those shippers with illegal rebates or discounts. *See Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908). The doctrine thus protects smaller shippers from being undercut competitively. *See In re Caravan Refrigerated Cargo, Inc.,* 864 F.2d 388, 390 (5th Cir.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990).

■ The Supreme Court has applied the filed rate doctrine quite strictly, often with harsh results. *See, e.g., Louisville & N.R.R. v. Maxwell,* 237 U.S. 94, 100, 35 S.Ct. 494, 496, 59 L.Ed. 853 (1915) (permitting railroad to recover undercharge on passenger's tickets where railroad employee had misquoted applicable fare to passenger). Shippers are charged with constructive knowledge of the rates, and are thus liable for the filed rate even if a carrier intentionally misquotes the applicable rate. *See Maislin,* 497 U.S. 116, 120, 110 S.Ct. 2759, 2763 ("[T]he statute does not permit either a shipper's ignorance or the carrier's misquotation of the applicable rate to serve as a defense to the collection of the filed rate."); *Maxwell,* 237 U.S. at 97, 35 S.Ct. at 495. Therefore, despite inequities, the Court has steadfastly maintained that the filed rate must prevail as the only legal rate, notwithstanding any equitable defenses the shippers might assert. *See Security Servs., Inc. v. K Mart Corp.,* 511 U.S. 431, ——, 114 S.Ct. 1702, 1706, 128 L.Ed.2d 433 (1994); *Maislin,* 497 U.S. at 131, 110 S.Ct. at 2769 ("we have never accepted the argument that such 'equities' are relevant to the application of § 10761").

A refashioning of the tariff filing system commenced with the advent of deregulation of the industry in the Motor Carrier Act of 1980 ("MCA"), Pub.L. No. 96–296, 94 Stat. 793. The MCA was an effort to make the forces of competition determine motor carrier tariffs, *see* H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 3–4, *reprinted in* 1980 U.S.C.C.A.N. 2283, 2285–86, but it did not represent a complete deregulation, for the filed rate doctrine was retained. The MCA did, however, make numerous changes that had an enormous impact on the trucking industry. Among several changes designed to encourage competition was a loosening of the then-cumbersome restrictions on carriers seeking to enter the industry. *See* H.R.Rep. No. 96–1069, at 3, 1980 U.S.C.C.A.N. at 2285; 49 U.S.C. § 10922 (amended by MCA § 5, 994 Stat. at 794–96). As a consequence, the number of licensed motor carriers more than doubled in the 1980s. *See* Wayne Johnson,

---

6. As a practical matter, filed rates serve the additional purpose of supplying the price term for the transactions. They thus complete the terms of a unilateral agreement by disclosing the rate to which parties will be bound, and upon which a carrier may collect. *See Security Servs., Inc. v. K Mart Corp.,* 511 U.S. 431, ——, 114 S.Ct. 1702, 1707, 128 L.Ed.2d 433 (1994) (fundamental purpose of tariffs is to "disclose the freight charges due to the carrier").

7. The ICC Termination Act has removed the prohibition against unreasonable discrimination with respect to motor carriers. The requirement remains only with regard to rail and pipeline carriers. *See* 49 U.S.C.A. §§ 10741, 15505 (West 1996) (added by ICC Termination Act §§ 102(a), 106(a), 109 Stat. at 819, 924); H.R.Conf.Rep. No. 104–422, 1995 U.S.C.C.A.N. at 928 (table).

*The Negotiated Rates Act of 1993: Congress Curtails Undercharge Litigation in Bankruptcy by Amending the Filed Rate Doctrine,* 68 Am.Bankr.L.J. 319, 335 (1994). As anticipated, this resulted in increasingly fierce competition among carriers.

In response to these increased competitive pressures, carriers began to set rates with most of their customers on an individual basis. This individualized pricing represented a significant departure from prior practice, in which class rates applied to any and all shippers whose commodities and desired routes fit within the parameters of a particular tariff.[8] The ICC, which had previously forbidden the practice of providing rates applicable only to individually named shippers on the ground that these rates were *per se* discriminatory, lifted that prohibition in 1984. Rates would now be evaluated on a case-by-case basis to determine whether they were discriminatory. *See Rates for a Named Shipper or Receiver,* 367 I.C.C. 959 (1984). The ICC subsequently authorized carriers to identify these individual shippers in their tariffs by using an alphabetical or numeric code instead of using the shipper's name. *See* Special Tariff Authority No. 86–639, *Outstanding Relief for "Shipper Account Codes"—Individual Motor Common Carriers and Freight Forwarders* (March 28, 1986) (amended April 29, 1986) (not published). Rate disparities, once strictly forbidden, became acceptable under certain circumstances.

A major consequence of this movement toward individualization was that many carriers, perhaps unable to keep up with the sheer volume of individualized rates, began to negotiate rates for shipments without filing a corresponding tariff with the ICC. After many inefficient carriers were forced into bankruptcy, trustees in bankruptcy for these carriers discovered that the carriers had often billed shippers at lower negotiated rates rather than the rates on file with the ICC. In an effort to maximize the value of the

bankruptcy estates, the trustees instituted adversary proceedings against those shippers, seeking to collect "undercharges," that is, the difference between the rate on file with the ICC and the rate actually billed.[9] The trustees argued for strict enforcement of the filed rate doctrine, over the objections of both shippers and the ICC.

The Supreme Court reaffirmed the primacy of the filed rate doctrine in *Maislin,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). In *Maislin,* a carrier challenged the ICC's "Negotiated Rates" policy, which had proscribed efforts by carriers to collect undercharges resulting from lower privately negotiated rates. The ICC had deemed these collection attempts an impermissible "unreasonable practice" under 49 U.S.C. § 10701. The Supreme Court struck down the Negotiated Rates policy, indicating that the ICA, "as it incorporates the filed rate doctrine, forbids as discriminatory the secret negotiation and collection of rates lower than the filed rate." *Maislin,* 497 U.S. at 130, 110 S.Ct. at 2768. The Negotiated Rates policy, if approved, would have effectively abrogated the rate-filing requirement that Congress had specifically retained in the MCA. Moreover, the Court found that "[b]y refusing to order collection of the filed rate solely because the parties had agreed to a lower rate, the ICC has permitted the very price discrimination that the Act by its terms seeks to prevent." *Id.* at 130, 110 S.Ct. at 2768. Thus, filed rates prevailed despite the perceived unfairness of a carrier collecting rates above those it quoted on account of its own negligence in failing to file its rates with the ICC.

## II.

P*I*E, a trucking company operating in interstate commerce and subject to regulation by the ICC, filed for bankruptcy on October 16, 1990, under Chapter 11 of the

8. This practice was part of a larger trend toward customization in the industry; rates were increasingly tailored to the particular shipment needs of customers. Discounts based on the volume of goods shipped, for instance, became prevalent; the ICC found that such discounts were not *per se* unlawful if they could be justified by cost savings to the carrier. *See Lawfulness of*

*Volume Discount Rates by Motor Common Carrier of Property,* 365 I.C.C. 711, 715–16 (1982).

9. The ICA provided carriers with a federal cause of action to collect undercharges from shippers. *See* 49 U.S.C. § 11706.

Bankruptcy Code.[10] P*I*E subsequently terminated its operations in January of 1991. The bankruptcy court converted the case to a Chapter 7 liquidation on March 11, 1991. Lloyd T. Whitaker, appellant here, was appointed trustee for the bankruptcy estate.

Beginning in July of 1991, Whitaker instituted adversary proceedings in the bankruptcy court against many former customers of P*I*E, seeking to collect undercharges and other charges allegedly owed to P*I*E. The district court estimated that approximately 32,000 claims were filed by the trustee. *See Whitaker*, 160 B.R. at 187. The district court withdrew its reference of the case to the bankruptcy court in some of these proceedings; it opted for a "lead case" approach to resolve issues common to these claims, and entered a case management order to that effect on February 12, 1993. The present action against Frito–Lay was selected as the "lead case" for the purpose of deciding whether a trustee can collect undercharges on the basis that coded tariffs are invalid.[11]

The typical undercharge claim involves rates negotiated by the carrier and shipper that the carrier never filed. This case is not a typical case; P*I*E did have a tariff on file with the ICC that reflected the rate it billed Frito–Lay. P*I*E's discount tariffs, however, did not identify by name the individual shippers receiving the rate; instead, an alphabetic or numeric code was used to indicate the shippers entitled to the discount in the tariff. The trustee advances the theory that these coded tariffs are void *ab initio*; they therefore do not constitute a valid rate and must be accorded the same treatment as rates never filed. The trustee proposes to enforce the undiscounted class rates instead of the discounted coded rates, and collect from Frito–Lay the difference between the two as an undercharge.

To support his position that the tariffs in question are void, the trustee raises essentially two arguments. First, he contends that because the coded rates allegedly did not comply with the mechanical publication and disclosure requirements of the ICA, they were never duly filed, effective tariffs. *See* 49 U.S.C. §§ 10761, 10762. Therefore, he alleges, they are void as a matter of law. Relying on the statutory prohibition against discrimination in rates, *see* 49 U.S.C. § 10741, Whitaker next argues that not including shipper identities in the tariffs defeats the purpose of the statutory scheme, because coded tariffs allegedly impair the ability of shippers to determine whether the rates they are being charged are discriminatory. He asserts that shipper account codes are designed to hide rather than to provide information, and that "no P*I*E competitor, or even the ICC, is able to determine what rate P*I*E would apply to any particular shipper, to any particular commodity or product, to any particular destination, or from any particular origin point." Because they are allegedly void, the full, undiscounted tariff rate on file is the only true, collectable "filed rate." According to Whitaker, the filed rate doctrine compels the result that he is entitled to collect the "undercharge." Both arguments raise one fundamental question: Does using a code to identify the shipper render filed tariffs incomplete, to the extent that they do not provide an ascertainable rate?

### III.

We review the legal determination made by the district court in its dismissal on the pleadings *de novo*; whether appellant possesses standing is a legal issue subject to *de novo* review. *See Jacobs v. The Florida Bar*, 50 F.3d 901, 903 (11th Cir.1995).

The district court's analysis compelled it to decide whether appellant was presenting a challenge to either (1) a tariff duly filed and "in effect" for purposes of the ICA, *see* 49 U.S.C. § 10761(a), or (2) an improperly filed, and thus void, tariff. It concluded that appellant was challenging the

---

**10.** P*I*E is now known as Olympia Holding Corporation.

**11.** Bankruptcy trustees, in an effort to collect undercharges, "pursue a three-pronged effort by challenging 'negotiated rates,' 'coded rates,' and

'contract carriage rates' for various technical violations." *In re Lifschultz Fast Freight Corp.*, 63 F.3d 621, 623 (7th Cir.1995). This appeal presents issues relevant to the second type of challenge.

former, and held that the trustee lacked standing to pursue this claim. *See Whitaker,* 160 B.R. at 192–94.[12] Like the district court, we conclude that the shipper-coded tariffs are valid as a matter of law, but rather than examining the trustee's claim from the perspective of standing, we inquire as to whether the trustee can maintain a cause of action to nullify retroactively the tariffs.[13] We conclude that such a cause of action is foreclosed, and therefore affirm the dismissal of the proceeding on the ground that the trustee has failed to state a claim.

### A.

Two central provisions of the former ICA are pertinent to our inquiry. Section 10761 provided that "a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter." 49 U.S.C.A. § 10761(a). Section 10762 mandated that common carriers "publish and file with the Commission tariffs containing the rates and ... classifications, rules, and practices related to those rates." 49 U.S.C. § 10762(a)(1). These provisions tell us little about what precisely must be stated in the filed tariffs.[14]

In response to *Maislin,* and in light of the worsening undercharge litigation crisis, Congress enacted the Negotiated Rates Act of 1993 ("NRA"), Pub.L. No. 103–180, 107 Stat. 2044.[15] In the NRA, Congress established prospective requirements that identified the precise information that must be included in tariffs. *See* 49 U.S.C. § 10762(b)(1). In so doing, the NRA specifically addressed the question of the validity of tariffs containing shipper codes. The NRA states:

> No tariff filed by a motor carrier of property with the Commission before, on, or after the date of the enactment of this subsection may be held invalid solely on the basis that a numerical or alpha account code is used in such tariff to designate customers or to describe the applicability of rates.

49 U.S.C. § 10762(h) (added by NRA § 5, 107 Stat. at 2050). The provision goes on to

---

**12.** According to the court, the trustee was mounting a challenge to the "lawfulness," as opposed to the "legality," of a series of rates. *Id.* at 193; *see I.C.C. v. Transcon Lines,* 990 F.2d 1503, 1515 (9th Cir.1992), *vacated and remanded,* 508 U.S. 969, 113 S.Ct. 2955, 125 L.Ed.2d 657, *cert. denied,* 508 U.S. 981, 113 S.Ct. 2987, 125 L.Ed.2d 683 (1993). Relying on *Transcon,* the court found it necessary to draw a distinction between the two types of challenges because it was persuaded by *Transcon's* reasoning that a carrier does have "standing to challenge the legality of its own rates." *See Whitaker,* 160 B.R. at 193 (quoting *Transcon,* 990 F.2d at 1515). While this analysis may be correct, we dispose of this appeal without invoking this confusing terminology.

**13.** The concepts of standing and cause of action are distinct and involve separate inquiries. *See United States Dep't of Labor v. Triplett,* 494 U.S. 715, 731 n. 2, 110 S.Ct. 1428, 1437 n. 2, 108 L.Ed.2d 701 (1990) (Marshall, J., concurring); *Dennis v. Higgins,* 498 U.S. 439, 461, 111 S.Ct. 865, 878, 112 L.Ed.2d 969 (1991) (Kennedy, J., dissenting). Because the standing question goes to the court's jurisdiction, it is a threshold question that must normally be reviewed prior to the consideration of substantive questions. *See Linda R.S. v. Richard D.,* 410 U.S. 614, 616, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). If a cause of action does not exist in favor of the plaintiff,

however, the standing question becomes immaterial and need not be addressed. *See National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 456, 465 n. 13, 94 S.Ct. 690, 692, 696 n. 13, 38 L.Ed.2d 646 (1974); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 492, 102 S.Ct. 752, 769, 70 L.Ed.2d 700 (1982) (Brennan, J., dissenting) (fundamental error to conduct standing inquiry without first considering whether the Constitution or a statute creates a cause of action for the alleged injury). Because we find that appellant lacks a cause of action, we do not need to discuss whether the appellant has standing.

**14.** Nor do the definitions in the Act clarify the matter. In the ICA, the term "rate" was defined as "a rate, fare, or charge for transportation." 49 U.S.C. § 10102(24). For a tariff to be "in effect" simply meant that the waiting period between the filing of the tariff and the date when it becomes effective had elapsed. *See* 49 U.S.C. § 10762(a)(2); *Short Notice Effectiveness for Independently Filed Motor Carrier and Freight Forwarder Rates,* 1 I.C.C.2d 146 (1984).

**15.** The district court did not have the benefit of the NRA when formulating its opinion; the NRA came into effect on December 3, 1993, subsequent to the district court's decision.

require that customer names be set forth in future filed tariffs. *Id.* The legislative history indicates quite clearly that this provision of the NRA "will settle the controversy over whether tariffs containing shipper account codes were legal. These tariffs were legal and[,] therefore, should not act as any basis for asserting an undercharge claim." H.R.Rep. No. 359, 103d Cong., 1st Sess. 10, *reprinted in* 1993 U.S.C.C.A.N. 2534, 2537. This provision of the NRA is retroactive and controls our decision in this case.[16] It supersedes any interpretation of the ICA offered by the ICC.[17]

### B.

■■■ Rather than undermining valid claims, the language in the NRA clarifies, and is a reflection of, our understanding of filed rate requirements prior to its passage. The authority Whitaker offers to support his position is not to the contrary. He relies heavily on *Regular Common Carrier Conference v. United States*, 793 F.2d 376 (D.C.Cir. 1986) ("*RCCC*"). *RCCC* involved a challenge to an order of the ICC that approved a tariff rule permitting freight forwarders to agree to provide services for shippers at unpublished rates.[18] The rates were calculated by averaging prior charges to the shipper. *Id.* at 378. The court in *RCCC* struck down the ICC authorization, indicating that the requirement for a rate contained within a tariff is "utterly central" to the ICA. *Id.* at 379. The averaging method did not meet the statutory filed rate requirement because no specifics were presented as to how this averaging would be conducted, and thus there was no means for anyone to calculate the applicable rate. *Id.* at 380. The holding in *RCCC* was therefore premised on the absence of an identifiable rate, and the possibility that the concept of "average rate" would serve merely as a pretext for what would become a process of unfettered discretion in setting rates.

Shipper account codes, however, present an issue distinct from that in *RCCC*. The missing information in *RCCC*—the amount to be charged—was so obviously crucial that its absence rendered the tariffs meaningless. The same is not true for shipper-coded tariffs; information as to whom the rates apply is not indispensable in determining what the "rate" is. Unlike the "averaging" method at

**16.** This court disposed of a constitutional challenge to the NRA in *Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.)*, 68 F.3d 1304, 1306 n. 3 (11th Cir.1995). In that case, which also involved the estate of P*I*E, appellant Whitaker argued that the NRA effectuated a taking of private property without just compensation in violation of the Fifth Amendment. We rejected this contention.

**17.** P*I*E petitioned for, and received, authority from the ICC to use shipper-coded rates in its tariffs. *See Special Tariff Authority No. 85–144, Customer Account Numbers, Ryder/P*I*E* (February 14, 1985) (not published). P*I*E was specifically granted authority to depart from the ICC regulation which provided that "[r]ates may be published for the account of a specifically named shipper or receiver." 49 C.F.R. § 1312.14(a)(3) (1995). The ICC subsequently entered *sua sponte* a blanket authorization granting all carriers permission to use shipper-coded rates. *See* Special Tariff Authority No. 86–639, *Outstanding Relief for "Shipper Account Codes"—Individual Motor Common Carriers and Freight Forwarders* (March 28, 1986) (amended April 29, 1986) (not published). Years later, the ICC revisited its policy on shipper coding and concluded that in some instances shipper-coded tariffs may not fully comply with the filed rate requirement. *See Reconsideration of Special Tariff Authorities Authorizing the Publication of Customer Account*

*Codes in Tariffs*, 1993 WL 330000 (ICC September 1, 1993). In *Reconsideration*, the ICC reaffirmed its position that shipper-coded tariffs are not *per se* unlawful, provided that they contain sufficient additional information to meet rate disclosure requirements. The ICC specifically cautioned that to the extent that it imposed any additional requirements for tariff filings in *Reconsideration*, they were to apply only prospectively.

The ICC's assessment of the validity of coded rates does not control the outcome of this case. Agency interpretations of a statute and regulations promulgated thereunder are entitled to deference if they are rational and consistent with the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Such interpretations must yield, however, in the face of a clear congressional statement which clarifies the issue, as the NRA does in this case.

**18.** A freight forwarder is "a transportation broker who assembles and consolidates numerous small shipments into one large load, arranges for long-haul transportation of the consolidated shipment, breaks the consolidated load into small individual shipments, and delivers those packages to the ultimate consignees." *RCCC*, 793 F.2d at 378.

issue in *RCCC*, the coded tariffs here do not permit unfettered discretion in rate setting. Rather, a precise, identifiable rate is set by the coded tariffs which binds both carrier and shipper.[19] Because they establish a binding price term that sets out the precise amount to be charged, the tariffs in this case comply with the ICA's requirement that carriers file their "rates."

Recent cases involving challenges to the validity of tariffs provide further guidance on filing requirements. One such challenge involved an ICC regulation that provides for automatic voiding of tariffs:

> [A] carrier may not participate in a tariff issued in the name of another carrier or an agent unless a power of attorney or concurrence has been executed. Absent effective concurrences or powers of attorney, tariffs are void as a matter of law.

49 C.F.R. § 1312.4(d) (1995). This provision was invoked in litigation concerning "distance guides," which are tariffs (often prepared by bureaus) that set out the distances between several locations used as origin and destination points for freight traffic. Carriers often provided rates in tariffs on a per mile basis (known as mileage rate tariffs) and then referred tariff users to the distance guides. Using the distance guides and mileage tariffs together, shippers would be able to compute the applicable rate, or charge, for a shipment between two given points. Some carriers that referred to distance guides, however, failed to execute the requisite powers of attorney, or permitted the powers of attorney to lapse, and therefore failed to "participate" in the distance guides.[20]

The Supreme Court resolved a challenge to the validity of a lapsed tariff in *Security Servs., Inc. v. K Mart Corp.*, 511 U.S. 431, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994) ("*K Mart*"). In *K Mart*, a bankrupt carrier sought to collect undercharges from a shipper by enforcing its tariff; the shipper asserted the defense that the filed rate doctrine precluded recovery because the alleged tariff was void for nonparticipation,[21] and thus there was no longer a filed rate. Noting that a rate based on mileage has two components, the rate per mile and the distances between shipping points, 511 U.S. at ——, 114 S.Ct. at 1706, the Court found that the tariff lacked "an essential element," and was an "incomplete tariff insufficient to support a calculation of charges." *Id.* at ——, 114 S.Ct. at 1708, 1710. The absence of mileage information constituted a failure as to the "fundamental purpose of tariffs: to disclose the freight charges due to the carrier." *Id.* at ——, 114 S.Ct. at 1707. The reasoning was therefore premised, as in *RCCC*, on the inability to calculate the applicable rate.[22]

The Court in *K Mart* did recognize that a tariff is not valid, or "effective," merely because it is on file with the ICC. It stated that "[t]rustees in bankruptcy ... may rely on the filed rate doctrine to collect for undercharges, but they may not collect for undercharges based on filed, but void, rates." 511 U.S. at ——, 114 S.Ct. at 1710 (citation omitted). The only ground that we perceive as sufficient for the dramatic step of invalidating an otherwise binding tariff occurs where there is an absence of a calculable rate. To strike down tariffs on a multitude

---

**19.** The ICA simply required that a "rate contained in a tariff ... shall be stated in money of the United States." 49 U.S.C. § 10762(a)(2). Given this provision and the definition of "rate" in the ICA, *see* 49 U.S.C. § 10102(24), we cannot say that inclusion of any more than a precise, binding transportation charge was mandated by the statute. In contrast, the statute has never required (prior to enactment of the NRA) that shipper names be included in the filing.

**20.** The ICA provided that "a motor carrier of property the application of whose rates is determined or governed by a tariff on file with the Commission cannot collect its rates unless the carrier is a participant in those tariffs." 49 U.S.C. § 10761(a).

**21.** The carrier's reference to the mileage guide was cancelled based on the carrier's failure to pay the participation fee.

**22.** The Court found that the ICC's policy in *K Mart* did not violate the general prohibition against retroactive rejection of tariffs. That rule was not apposite because "the void-for-nonparticipation regulation does not apply retroactively"; instead, it operates like an expiration of the tariffs that applied only after the date when they lapse. *K Mart*, 511 U.S. at ——, 114 S.Ct. at 1709. As is discussed below, the tariffs in this case do present us with an instance in which retroactive invalidation of tariffs is sought.

of other alleged deficiencies would undermine the filed rate doctrine and would detract from the certainty in ratemaking espoused by the ICA.[23]

## C.

 We conclude that appellant is asserting a challenge to legal and effective tariffs. We must therefore consider whether we have authority retroactively to reject the tariffs. We conclude that we cannot. Congress delegated to the ICC the authority to approve or reject tariff filings; it did not give the ICC general authority to reject tariffs retroactively. *See ICC v. American Trucking Ass'ns, Inc.*, 467 U.S. 354, 364, 104 S.Ct. 2458, 2464, 81 L.Ed.2d 282 (1984). In *American Trucking,* the Court established two criteria that must be met before the ICC can retroactively void effective tariffs. The action must "further a specific statutory mandate of the Commission," and "must be directly and closely tied to that mandate." 467 U.S. at 367, 104 S.Ct. at 2465. A rejection of the tariffs in this case would thwart the mandate of Congress with respect to shipper-coded tariffs. Therefore, even if the retroactive rejection of tariffs were a matter within our jurisdiction and outside the ICC's primary jurisdiction, we could not reject the tariffs, for we are not empowered to replace Congress' view on this issue with our own. We therefore direct the district and bankruptcy courts to treat the shipper-coded tariffs as valid and enforceable.

## IV.

Because Congress has declared the practice at issue in this case "legal," it is clear that appellant's argument has been considered and refuted by Congress. Even assuming that appellant's allegations regarding shipper coding are true, they do not support a claim that the tariffs are invalid or violate the ICA. Hence, appellant can prove no set of facts that would entitle him to relief. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir.1994) ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief."). Whitaker's complaint fails to state a claim for relief against Frito–Lay, and must be dismissed.[24]

AFFIRMED.

---

23. It is for this reason that the Supreme Court developed the "technical defect" doctrine, which provides that as long as a tariff is "adequate to give notice" of the rate to be charged, it is enforceable despite the failure to comply with all tariff requirements. *See, e.g., Berwind–White Coal Mining Co. v. Chicago & Erie R.R.*, 235 U.S. 371, 375, 35 S.Ct. 131, 132, 59 L.Ed. 275 (1914). The Court in *K Mart* rejected the argument that the tariff in question suffered from a mere "technical defect"; it distinguished the "technical defect" cases because, "[u]nlike the shippers in the 'technical defect' cases, the shipper here could not determine the carrier's rates." 511 U.S. at ——, 114 S.Ct. at 1710.

24. Appellant proposes to extend this matter further by seeking a remand to the district court for further findings as to invalidity of the tariffs on other grounds. He asserts that while the tariffs may not be invalidated solely because of the codes, the codes along with some unspecified defects may be sufficient to render the tariffs invalid. In light of our finding that a rate is ascertainable from the coded tariffs, appellant's additional claims are foreclosed. A remand is, therefore, not warranted, and we decline to adopt appellant's suggestion.