### IPEC PLANAR, an Arizona corporation, Plaintiff,

v.

### MACH 1 AIR SERVICES, INC., an Arizona corporation Defendant.

### Mach 1 Air Services, Inc., an Arizona corporation, Third–Party Plaintiff,

v.

### Landstar Ranger, Inc., a Delaware corporation, Third–Party Defendant.

### No. CIV 99–506–PHX–EHC.

United States District Court, D. Arizona.

Aug. 10, 2000.

Herman C Zickerman, Jr, West Christoffel Konigsberg & Zickerman PC, Tucson, AZ, Todd B Denenberg, Grotefeld & Denenberg LLC, Bingham Farms, MI, for Ipec Planar.

Jeffrey R Simmons, DeConcini McDonald Yetwin & Lacy PC, Phoenix, AZ, for Mach 1 Air Services, Inc.

Ryan Emmett Kelly, Baumann Kelly Paytas & Bernstein, Phoenix, AZ, for Landstar Ranger, Inc.

## ORDER

CARROLL, District Judge.

Plaintiff Ipec Planar ("Ipec"), an Arizona corporation, filed this action against Mach 1 Air Service ("Mach I"), an Arizona corporation, in Maricopa County Superior Court. Ipec alleges claims for bailment, negligence, and breach of contract against Mach I in connection with the transportation and delivery of equipment valued at $3.5 million.

Mach I removed to federal court pursuant to 49 U.S.C. § 14706 and 28 U.S.C. §§ 1331 and 1337. Mach I filed a cross-claim against Landstar Ranger, Inc. ("Landstar"), a Delaware corporation, the entity that actually transported the equipment at issue.

Mach I has filed a motion for summary judgment regarding the maximum amount of its liability to Ipec. Landstar has filed a motion for partial summary judgment against Mach I and Ipec regarding the maximum amount of its liability to them. Those motions are discussed below.

### I. Background

Ipec manufactures and distributes planarization machinery used in the production of silicon wafers and semi-conductors for computer chips. Ipec frequently ships its goods using various carriers. (Ex. A to Defendant's Statement of Facts, hereafter "DSOF"). Ipec's shipping department was comprised of a lead shipper and three other employees. (Ex. A to DSOF). The lead shipper at times relevant to this action was Greg Courtright. (Ex. A to DSOF). Courtright and the shipping department were supervised by Paul Tome, Ipec's inventory control manager. (Ex. A to DSOF). Tome established a policy of shipping products at the lowest tariff to substantially reduce shipping costs. (Ex. B to DSOF). Ipec relied on its general insurance policy to cover damage to its shipments during transportation. (Ex. B to DSOF).

In July 1998, Courtright contacted Mach I to arrange shipment of a polisher from Phoenix to a trade show in San Francisco because Mach 1 had submitted the lowest bid to do so. (Ex. A and B to DSOF). Ipec had previously utilized Mach 1 several hundred times during the preceding six years to transport its products and Courtright and Tome were familiar with Mach 1's rates and waybill. In fact, Ipec had preprinted waybills for such shipments and sent approximately fifteen shipments a day via Mach 1. Mach 1 arranged for Landstar, an independent motor carrier, to transport Ipec's polisher to San Francisco. (Ex. C to DSOF).

On July 6, 1998, Ipec delivered to Landstar six crates identified as polisher parts weighing 17,000 and valued at $3.5 million for transport to San Francisco. (Ex. D to DSOF). Ruben Del Rio, an Ipec shipper, met the Landstar truck and loaded the crates on Landstar's trailer. (Ex. D to DSOF). Del Rio signed Mach 1's waybill, # 3066014.[1] (Ex. D and E to DSOF).

The waybill provided that:

UNLESS A GREATER VALUE IS DECLARED HEREIN, THE SHIPPER AGREES AND DECLARES THAT THE VALUE OF THE PROPERTY IS RELEASED TO AN AMOUNT NOT EXCEEDING $50.00 OR 50¢ PER POUND WHICHEVER IS HIGHER.

(Ex. E to DSOF). The back of the waybill set forth Mach I's "Conditions of Contract." Paragraph 2 of the waybill provided that the waybill was subject to Mach 1's applicable tariffs and regulations. (Ex. F to DSOF). Paragraph 7 of the Conditions of Contract provided that:

Charges for Declared Value

(A) The liability of Mach 1 Air Services, Inc. with regard to any shipment is limited to the sum of $50.00 or 50¢ per pound, whichever is higher, unless a

---

1. Ipec utilized one of its preprinted Mach 1 waybills.

higher value is declared for the shipment at time of tender.

(B) Declared value charge will be calculated at a rate of 50¢ per $100.00 of declared value or fraction thereof.

(C) Cash on Delivery (C.O.D.) Shipments–Shipper must enter the amount of any shipper's C.O.D. on the carrier's air waybill, which shall be collected subject to the fees and rules of the delivering carrier. If no declared value is listed, then the C.O.D. amount of the shipment shall be deemed the declared value for carriage and the appropriate valuation charge shall be applicable.

(D) SHIPMENTS EXCEEDING $15,000.00 IN DECLARED VALUE MUST RECEIVE PRIOR WRITTEN APPROVAL FROM MACH 1 AIR SERVICES, INC. CORPORATE MANAGEMENT IN ORDER TO OBTAIN COVERAGE.

(Ex. F to DSOF). Finally, paragraph 13 provided that:

Debtor does hereby acknowledge and waive its right to raise the defense of lack of personal jurisdiction in any lawsuit commenced by Mach 1 Air Services, Inc. against the debtor. Debtor does hereby consent to the exercise of personal jurisdiction over it by the Arizona Superior Court in and for the County of Maricopa and/or the Tempe Precinct of the Maricopa County, Arizona Justice Court in any lawsuit commenced against the debtor by Mach 1 Air Services, Inc. Debtor and Mach 1 Air Services, Inc. do also stipulate that the laws of the State of Arizona shall apply to any lawsuits commenced under this agreement.

(Ex. F to DSOF).

Mach 1's tariff provided that:

[Mach 1's] LIABILITY FOR ALL SHIPMENTS SHALL BE LIMITED TO THE HIGHER OF $50.00 PER SHIPMENT OR $0.50 PER POUND ($1.10 PER KILOGRAM) OF CARGO LOST OR DAMAGED, PLUS THE TRANSPORTATION CHARGES APPLICABLE TO THAT PART OF THE SHIPMENT DAMAGED OR LOST, UNLESS AT THE TIME THE SHIPPER TENDERED THE SHIPMENT, THE SHIPPER MADE A DECLARATION OF VALUE FOR CARRIAGE IN THE SPACE DESIGNED ON THE WAYBILL, AND AN ADDITIONAL VALUATION CHARGE IS PAID. WHEN SUCH A DECLARATION IS MADE, OUR LIABILITY SHALL IN NO EVENT EXCEED THE DECLARED VALUE OF THE SHIPMENT, PLUS APPLICABLE FREIGHT CHARGES OR THE AMOUNT OF LOSS OR DAMAGE SUSTAINED, WHICHEVER IS LOWER.

(Ex. G to DSOF).

Del Rio did not declare a higher value for the shipment on the waybill, consistent with Ipec's policy, described above. (Ex. D to DSOF). Landstar took custody of the shipment. Later that day, Landstar's truck and trailer were involved in an accident near Quartzite, Arizona. Ipec's goods were destroyed.

Ipec filed a claim with Mach 1 which was denied. Ipec thereafter filed this suit alleging claims for bailment, negligence and breach of contract under Arizona law. Mach I and Landstar seek summary judgment as to the extent of their liability for damages.

## II. Standard for Summary Judgment

Summary judgment is appropriate when the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "One of the principal purposes of the summary judgment rules is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The dispute must also be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* There is no issue for trial unless there is sufficient evidence favoring the non-moving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50, 106 S.Ct. 2505. In a civil case, the question is:

> whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. 2505.

The moving party who has the burden of proof on the issue at trial must establish all of the essential elements of the claim or defense for the court to find that the moving party is entitled to judgment as a matter of law. *See Fontenot v. Upjohn,* 780 F.2d 1190, 1194 (5th Cir.1986); *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Thus, summary judgment is proper if the non-moving party fails to make a showing sufficient to establish the existence of an essential element of their case on which they will bear the burden of proof at trial. *See id. See also, High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563 (9th Cir.1990).

### III. Mach 1's Motion for Summary Judgment

#### A. Preemption

Mach 1 argues that the Motor Carrier Act of 1935, as amended, preempts Ipec's state and common law claims for damage to Ipec's shipment and argues that Ipec's complaint should therefore be dismissed. Ipec argues that the choice of law provision on the back of the waybill reflects the parties opted out of application of the Motor Carrier Act pursuant to 49 U.S.C. § 14101(b)(1).[2]

Congress intended the Motor Carrier Act, as amended, to completely govern claims arising out of damage or loss to property transported by interstate carriers. *See Adams Express Co. v. Croninger,* 226 U.S. 491, 505–506, 33 S.Ct. 148, 57 L.Ed. 314 (1913). The Act's broad scope preempts state law claims arising out of the loss or damage to property transported by interstate carriers. *See Rini v. United Van Lines, Inc.,* 104 F.3d 502, 506 (1st Cir.1997); *Cleveland v. Beltman North Am. Co., Inc.,* 30 F.3d 373, 379 (2d Cir.1994); *Moffit v. Bekins Van Lines Co.,* 6 F.3d 305, 306–307 (5th Cir.1993); *Shao v. Link Cargo (Taiwan) Ltd.,* 986 F.2d 700, 706–707 (4th Cir.1993); *Hughes Aircraft v. North Am. Van Lines,* 970 F.2d 609, 613 (9th Cir.1992); *Underwriters at Lloyds of London v. North Am. Van Lines,* 890 F.2d 1112, 1120 (10th Cir.1989); *Hughes v. United Van Lines,* 829 F.2d 1407, 1415 (7th Cir.1987); *W.D. Lawson & Co. v. Pennsylvania Central Co.,* 456 F.2d 419, 421 (6th Cir.1972).

However, section 14101(b)(1) provides that:

> A carrier ... may enter into a contract with a shipper ... to provide specified services under specified rates and conditions. If the shipper and carrier, in writing, expressly waive any and all rights and remedies under this part for the transportation·covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies.

---

**2.** It further argues that under Arizona law, Mach 1 could not limit its liability to $0.50 per pound and that it is therefore liable for the full value of Ipec's shipment.

Ipec argues that the parties opted out of application of the Motor Carrier Act pursuant to § 14101(b)(1) and that the choice of law provision on the reverse of the waybill constituted the parties' agreement to opt out of application of the Act. The Court concludes otherwise.

Prior to 1980, a motor carrier was required to register and operate as either a contract or common carrier. *See Gross Common Carrier, Inc. v. Baxter Healthcare Corp.*, 51 F.3d 703, 707 (7th Cir.1995). *See also, Whitaker v. Frito–Lay, Inc.*, 88 F.3d 952, 954 (11th Cir.1996). A common carrier was required to publish its rates in a tariff filed with the (now abolished) Interstate Commerce Commission ("ICC") and the carrier's published rate governed the relationship between the shipper and the carrier, which in turn furthered a policy against discrimination in restraint of trade in the transportation industry. *See Gross Common Carrier*, 51 F.3d at 706 ("A common carrier must hold out its services indiscriminately to all shippers and adhere to the transportation rate it publishes with the ICC"); *Whitaker*, 88 F.3d at 954. Unlike motor common carriers, the rates of motor contract carriers were set out in continuing, individual agreements with particular customers, and these carriers were exempt from the filed rate doctrine. *See Whitaker*, 88 F.3d at 954–55; *Gross Common Carrier*, 51 F.3d at 706.

Under amendments taking effect beginning in 1980, a carrier could operate as a common and/or a contract carrier with the determination of the capacity in which it operated governing whether the carrier's tariff, if there was one, applied.[3] *See id.* at 707. To determine whether the type of carriage provided by a motor carrier to a particular shipper was contract or common, the ICC applied a three prong test. *See id.* Under this test, a contract carriage existed if (1) a carrier held appropriate contract carrier authority to provide the service at the time of contracting; (2) the shipper and the carrier had reached an agreement that the transportation to be provided would be contract carriage; and (3) the shipments moved under the parties' agreement in a manner consistent with the statutory definition of contract carriage. *See id.* "The statutory definition of contract carriage requires that a shipment move under a 'continuing agreement' and that the transportation services be designed to meet the 'distinct needs' of the shipper." *Id.* (quoting 49 U.S.C. § 10102(15), repealed by 1995 amendments). *See also, In re Transcon*, 89 F.3d at 566.

In 1995, the ICC Termination Act ("the ICCTA") was enacted becoming effective January 1, 1996. *See Whitaker*, 88 F.3d at 955, n. 2. The ICCTA abolished the ICC and it also abolished the requirement that common carriers file tariffs with the ICC, or its successor, the Surface Transportation Board ("STB"). *See Whitaker*, 88 F.3d at 955, n. 2. Instead, under the ICC-TA, a common carrier was only required to maintain a tariff and provide a copy of its tariff to shippers upon request. *See* 49 U.S.C. § 14706.

---

**3.** In the past, both contract and common carriers were required to file tariffs with the now-defunct Interstate Commerce Commission. Congress eliminated that requirement as to contract carriers'in 1980. *See Reo Distribution Servs., Inc. v. Fisher Controls Int'l, Inc.*, 985 F.Supp. 647, 653 n. 12 and 13 (W.D.Va.1995) (since 1983 contract carriers have been exempt from the requirement to file rates); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.*, 849 F.Supp. 1296,1298 n. 1, 1301 (E.D.Ark.1994)(describing the differences between contract and common carriers, the applicability of the Negotiated Rates Act of 1993 to resolve disputes regarding the capacity in which a carrier acted, and pre–1996 amendments to the Motor Carrier Act); *see. also, In re Transcon Lines*, 89 F.3d 559, 566 (9th Cir.1996)("Unlike common carriage, which involves services held out indiscriminately to all shippers, contract carriage is limited to shippers with which carriers enter into specific agreements or contracts" defined by the ICA "as a person providing motor carriage under 'continuing agreements' by either assigning vehicles for the 'exclusive use' of a shipper or providing services designed to meet that shipper's 'distinct needs,' " quoting 49 U.S.C. § 10102(16)(B)(i)-(ii)).

■ The language of § 14101 reflects that it applies only to contract carriage. *See* Stephen G. Wood, *Multimodal Transportation: An American Perspective on Carrier Liability and Bill of Lading Issues*, 46 Am. J. Comp. L. 403, 411 (1998). There is no evidence that Congress intended § 14101 to apply to common carriage, nor is there evidence that Mach 1 acted as a contract carrier in connection with the shipment at issue.

■ Finally, the language of the choice of law paragraph on the waybill refers to the "debtor" rather than to the shipper, as in the preceding paragraphs. The reference to debtor reflects the intention that Arizona law govern actions commenced by Mach 1 to recover unpaid costs for shipments, rather than an intention that Arizona law govern all actions arising from the waybill or the intent to waive application of the Motor Carrier Act. Accordingly, the Court finds that the parties did not opt out of application of the Motor Carrier Act and that the Act preempts Plaintiff's claims. Rather than dismiss Plaintiff's claims for failure to state a claim, the Court construes Plaintiff's complaint to allege claims pursuant to the Motor Carrier Act.

### B. Limitation of Liability

■ Mach 1 and Landstar both seek summary judgment limiting Ipec's recovery under the Motor Carrier Act to that specified in Mach 1's tariff and waybill.[4] Under the Motor Carrier Act, a common carrier is liable "for the actual loss or injury to the property" of a shipment. *See* 49 U.S.C. § 14706(a). However, a common carrier may limit its liability to the value declared by the shipper to an amount agreed upon between the shipper and it. *See* 49 U.S.C. § 14706(c)(1)(A). Such agreement of the parties can incorpo-

rate a limitation of liability contained in a carrier's tariff, but the carrier must provide to "the shipper, on the request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment ... is based."[5] 49 U.S.C. § 14706(c)(1)(B).

Mach 1's waybill provided that the shipment was subject to Mach 1's applicable tariffs and regulations which the waybill incorporated by reference. The waybill also contained the same limitation of liability as Mach 1's tariff, *i.e.*, the higher of $50.00 per shipment or $0.50 per pound, plus transportation charges applicable to that part of the shipment damaged or lost, unless a shipper made a higher declaration of value in the space designated on the waybill and an additional valuation charge was paid.

49 U.S.C. § 14706(a) provides that:

(1) A carrier providing transportation or service ... shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service ... are liable to the person entitled to recover under the receipt or bill of lading. **The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States ... when transported under a through bill of lading and, except in the case of a freight forwarder, applies to property reconsigned or diverted under a tariff under section 13702.** Failure to issue a receipt or bill of lading does not affect the

---

4. In the alternative, Landstar seeks summary judgment as to the extent of Mach 1's liability under Arizona law, which it argues is the same as that under the Carmack Amendment.

5. Prior to the abolition of the ICC, carriers were required to maintain a tariff on file with

the ICC. Carriers are not required to maintain their tariffs with the ICC's successor, the STB. *See Jackson v. Brook Ledge, Inc.*, 991 F.Supp. 640, 645 (E.D.Ky.1997); *Nieman Marcus Group, Inc. v. Quast Transfer, Inc.*, 1999 WL 436589, Fed. Carr. Cas. ¶ 84,108 (N.D.Ill. 1999).

liability of a carrier. A delivering carrier is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.

(2) **Freight forwarder.—A freight forwarder is both the receiving and delivering carrier. When a freight forwarder provides service and uses a motor carrier providing transportation ... to receive property from a consignor, the motor carrier may execute the bill of lading or shipping receipt for the freight forwarder with its consent.** With the consent of the freight forwarder, a motor carrier may deliver property for a freight forwarder on the freight forwarder's bill of lading, freight bill, or shipping receipt to the consignee named in it, and receipt for the property may be made on the freight forwarder's delivery receipt.

(Emphasis added).

A "carrier" is defined as a "a motor carrier, a water carrier, and a freight forwarder." 49 U.S.C. § 13102(3). A "freight forwarder" is defined as:

a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of business—

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

The term does not include a person using transportation of an air carrier subject to part A of subtitle VII.

49 U.S.C. § 13102(8).

■ For a limitation of liability on a waybill to be effective under § 14706, a carrier must: (1) maintain a tariff; (2) give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to its choice of liability; and (4) issue a bill of lading reflecting that agreement prior to moving a shipment. *See Hughes Aircraft*, 970 F.2d at 611–12. These are addressed in turn.

A carrier can satisfy the first part of the test if it makes its tariff available to a shipper on request. *See* 49 U.S.C. § 13710(a)(1). Evidence supports that Mach 1 made its tariff available to shippers, specifically Ipec, on request. Accordingly, the first part of the test is satisfied.

To satisfy the second and third parts of the test, a shipper must have been given a "reasonable opportunity" to choose to accept the carrier's proposed liability limit. *See Hughes Aircraft*, 970 F.2d at 612. "A reasonable opportunity to choose between different levels of coverage means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Id.* (quoting *Bio–Lab, Inc. v. Pony Express Courier Corp.*, 911 F.2d 1580, 1582 (11th Cir.1990)).

Tome testified that Ipec knew that Ipec had the choice of selecting Mach 1's liability limit, or alternatively, declaring a higher value and paying the difference in shipping costs. He further testified that Ipec had a policy of not declaring value relying on its general property insurance coverage to cover the value of damaged shipments so as to take advantage of lower shipping rates. Del Rio followed that policy in not declaring a higher value for the shipment. Mach 1 has established the second and third parts of the test.

Finally, Mach 1 must establish that it issued a waybill reflecting Ipec's acceptance of Mach 1's liability limit prior to Landstar taking custody of the shipment. There is no dispute that Mach 1's waybill contained its liability limit and gave Ipec

the choice of declaring a higher value instead of accepting the limitation. There is also no dispute that Ipec's representative, Del Rio, did not declare a higher value for the shipment before accepting the liability limit contained in the waybill.

No issue of material fact exists that Mach 1 effectively limited its liability. Accordingly, Mach 1's motion for summary judgment on the extent of its liability will be granted and its maximum liability will be limited to that stated in its tariff and waybill.

Landstar seeks summary judgment regarding the maximum amount of its liability to Mach 1 and Ipec, *i.e.*, that its liability is limited to that stated in Mach 1's waybill and tariff. For the reasons discussed above, Landstar's motion for summary judgment will be granted.

The resolution of the extent of the liability of Mach 1 and Landstar on summary judgment resolves this action. Accordingly, judgment will be entered for Mach 1 and Landstar.

The Court being fully advised,

**IT IS ORDERED** granting Mach 1's motion for summary judgment regarding the maximum amount of its liability to Plaintiff. . (Dkt.15).

**IT IS FURTHER ORDERED** granting Landstar Ranger's motion for partial summary judgment regarding the maximum amount of its liability for damages to Mach 1 and Ipec. (Dkt.12).