[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-12100

_____

D.C. Docket No. 0:15-cv-62600-JIC

PANKAJ PATEL,
LAKETHA WILSON,

                                                            Plaintiffs - Appellants,

versus

SPECIALIZED LOAN SERVICING, LLC,
AMERICAN SECURITY INSURANCE COMPANY,

                                                            Defendants - Appellees.

_____

No. 16-16585

_____

D.C. Docket No. 1:15-cv-24542-JG

RICHARD L. FOWLER,
GLENDA KELLER,
YVONNE YAMBO-GONZALEZ,
on behalf of themselves and all others similarly situated,

                                                            Plaintiffs - Appellants,

versus

CALIBER HOME LOANS, INC,
individually and as successor-in-interest to
Vericrest Financial and Caliber Funding,
AMERICAN SECURITY INSURANCE COMPANY,

                                                            Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(September 24, 2018)

Before JORDAN, HULL, and BOGGS,* Circuit Judges.

BOGGS, Circuit Judge:

When an individual takes out a mortgage, he or she secures the loan with real property. To protect its security interest, lenders usually require borrowers to maintain hazard insurance in an amount that is at least equal to the loan's unpaid principal balance. Should a borrower fail to obtain or maintain adequate coverage, the mortgage may authorize the lender to purchase insurance for the property and to charge the borrower for the cost of coverage. Such coverage is known as "force-placed insurance" ("FPI") or "lender-placed insurance." Typically, the task of monitoring borrowers' insurance coverage—and force-placing it when necessary—is farmed out to a loan servicer.

The plaintiffs in these consolidated cases are borrowers who allege that their mortgage servicers, Specialized Loan Servicing, LLC ("SLS") and Caliber Home

_____

* Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

Loans, Inc. ("Caliber"),[1] breached the plaintiffs' loan contracts, as well as an implied covenant of good faith and fair dealing, by charging "inflated amounts" for FPI.  Specifically, the plaintiffs claim that SLS and Caliber received "rebates" or "kickbacks" from the force-placed insurer, American Security Insurance Company ("ASIC"), but that they did not pass these savings on to the borrowers.  As such, the plaintiffs allege that SLS and Caliber violated the terms of the mortgage contracts, which authorized the servicers to charge only for the "cost of the insurance."  In the alternative to these contractual claims, the plaintiffs pleaded an unjust-enrichment claim against the servicers.

Additionally, because the plaintiffs claim that SLS and Caliber colluded with ASIC to disguise the alleged overcharges as legitimate expenses, they also accuse SLS and Caliber of violating the Federal Truth in Lending Act, 15 U.S.C. § 1601; ASIC of tortious interference with a business relationship and unjust enrichment; and all three companies of violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), (d).  Patel and Wilson further allege that SLS's actions violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201.

---

[1] Caliber was created in 2013 when Vericrest Financial and Caliber Funding merged operations.  Although this lawsuit also challenges the FPI practices of Caliber Home Loan's predecessors, for ease of exposition, we will refer to their actions as those of Caliber.

3

Complicating this otherwise run-of-the-mill contract dispute is the fact that ASIC's FPI rates have been filed with, and approved by, state regulators in the relevant jurisdictions.[2]  Because of this, the possibility arises that the plaintiffs' claims are barred by the filed-rate doctrine, which, inter alia, "precludes any judicial action which undermines agency rate-making authority." *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004) (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998)).  The issue before us now is whether the plaintiffs' claims are so barred.

Because we conclude that the plaintiffs, in their complaints, challenge a rate filed with regulators, we hold that the filed-rate doctrine applies.  We accordingly affirm the district courts' dismissals of the cases under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

I

A

In June 2005, Pankaj Patel, a Florida citizen, signed a mortgage agreement with nonparty IndyMac Bank, which required him to maintain hazard insurance on the subject property for the life of the loan.  In pertinent part, the agreement stated:

---

[2] The plaintiffs do not dispute that the FPI premiums charged to and paid by the plaintiffs were not more than the insurance rates filed with, and approved by, the relevant state regulators.

**5. Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  . . .

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard[,] or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.
. . .

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument**.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture. . .), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

Patel Compl., Exhibit A, at 5–7.

5

In June 2014, Patel's voluntary coverage lapsed.  Shortly thereafter, ASIC—

with whom SLS had subcontracted to monitor its loan portfolio—sent Patel a letter

informing him that if proof of coverage was not provided, SLS would purchase

insurance on his behalf.  The notice advised Patel of his right to obtain coverage

from an insurance agent or company of his choice, "urge[d] [him] to do so,"

informed him that insurance bought by SLS was "likely" to have a "much higher"

cost and to provide less coverage than what he could obtain on his own, and stated

that "[t]he insurance we obtain may provide benefits to you but is primarily for the

benefit of SLS."[3]  ASIC Motion to Dismiss, Exhibit 1, at 4–5 (No. 0:15-cv-62600-

JIC).  It further disclosed that "if [SLS] purchase[d the] insurance . . . , an affiliate

of SLS [could] benefit" by receiving a commission and that "[t]he insurance

company may factor such commission into the rate charged for the coverage."  *Id.*

at 5.  The notice closed by "strongly recommend[ing]" that Patel obtain his own

coverage.

---

[3] "Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (per curiam).  An exception exists, however, where "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Ibid.*  Because the various letters and FPI policies that SLS sent to Patel and Wilson are referenced in the complaint, are central to the plaintiffs' claims, were attached to ASIC's Motion to Dismiss, and were not disputed when they were introduced below, we will consider them.

For the same reason, we will consider the notices and FPI policies that Caliber sent to Fowler, Yambo-Gonzalez, and Keller.

One month later, SLS sent Patel a second notice, stating that it still had not received evidence of insurance. This letter included an insurance binder that disclosed the annual premium of the policy that SLS would purchase if it did not receive proof of coverage. On August 22, 2014, after Patel had yet again failed to provide proof of the contractually-required insurance, ASIC issued a one-year FPI certificate for the property, effective from June 2014. The policy "authorized [SLS] to advance all funds to be recovered from the *borrower* for the insurance afforded[.]" ASIC Motion to Dismiss, Exhibit 3, at 12 (No. 0:15-cv-62600-JIC). On June 5, 2015, Patel obtained voluntary coverage.

Patel's experience is representative of that of the remaining plaintiffs. Wilson, Fowler, and Yambo-Gonzalez are Florida citizens whose mortgage contracts contained provisions that were identical to those quoted above, while Keller, a Pennsylvania citizen, signed a mortgage contract containing materially similar provisions.[4] Each also received at least one notice from his or her servicer,

---

[4] Keller's mortgage stated:

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require.

. . .

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then

7

which stated that hazard insurance would be force-placed if voluntary coverage was not obtained and that the cost of FPI was likely to be "much higher" or "substantially higher" than the cost of insurance that he or she could obtain on his or her own.  Keller, for instance, received two letters warning that the cost of insurance bought by Caliber was "likely to be much higher than the cost of coverage [she] could obtain on [her] own" and that "OBTAINING [HER] OWN INSURANCE [WAS] IN [HER] BEST INTEREST."  ASIC Motion to Dismiss, Exhibits C-1 and C-2 (No. 1:15-cv-24542-JG).  When the plaintiffs failed to heed these various warnings, their respective servicers force-placed insurance. Furthermore, Wilson, Fowler, and Yambo-Gonzalez were informed, in writing, that were the servicer to purchase insurance on their behalf, an affiliate could earn commissions or income from the transaction.  Finally, like Patel, Fowler and Keller

---

Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the contract rate, shall become additional indebtedness of Borrower secured by this Mortgage.  Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof.  Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

Caliber Motion to Dismiss, Exhibit (No. 1:15-cv-24542-JG).

received insurance certificates containing provisions that authorized their servicers to "advance all funds to be recovered from the *borrower* for the insurance afforded[.]"[5] ASIC Motion to Dismiss, Exhibits A-3 and C-3 (No. 1:15-cv-24542-JG).

B

At the time that insurance was force-placed on the plaintiffs, ASIC was the exclusive provider of FPI for SLS and Caliber. As part of this arrangement, prior to any lapse in the plaintiffs' hazard insurance, ASIC had already issued a master insurance policy to each servicer that covered the entirety of its mortgage-loan portfolio. In exchange, ASIC performed many of SLS's and Caliber's loan-servicing functions. Most notably, ASIC and its affiliates monitored SLS's and Caliber's loan portfolio for lapses in borrowers' insurance coverage, and once a lapse was identified, ASIC sent the borrower a notice—on either SLS's or Caliber's behalf—informing him or her that insurance would be force-placed if voluntary coverage was not obtained. If the lapse continued, ASIC then issued an insurance certificate, at the borrower's expense, based on the already-existing master policy.

---

[5] Between 2009, when Yambo-Gonzalez's voluntary insurance first lapsed, and June 2014, the insurance certificates that she received did not contain this provision. Beginning in June 2014, however, they did.

Once coverage was issued, two further transactions occurred. First, the servicer paid ASIC for the insurance certificate, for which it then billed the borrower. Second, ASIC paid the servicers, or their affiliates, either a fee related to the placement of the coverage or premiums for the servicers' reinsurance of the FPI policy.

On December 10, 2015, Patel and Wilson filed a class-action complaint against SLS and ASIC, alleging that in exchange for an exclusivity agreement, ASIC provided "kickbacks" to SLS in the form of "illusory reinsurance that carrie[d] no commensurate transfer of risk[,]" below-cost mortgage services that were unrelated to FPI, "'expense reimbursements' allegedly paid . . . for expenses . . . incurred in the placement of FPI coverage notwithstanding the fact that the coverage is automatically issued pursuant to a master policy already in place[,]" and "unearned 'commissions' . . . for work purportedly performed to procure individual policies when no work [was] actually performed[.]" Patel Compl. ¶ 5. In their complaint, the two also asserted that "[b]orrowers ultimately bear the cost of these kickbacks [because] SLS and ASIC bundle the costs into the amounts charged for insurance coverage . . . , disguising the charges as legitimate by characterizing them as income earned by SLS when, in fact, they are unearned[,] unlawful profits." *Ibid.*

10

The same day, Fowler, Yambo-Gonzalez, and Keller filed a separate class-action complaint against Caliber and ASIC. The complaint's allegations are nearly identical to those in the complaint of Patel and Wilson: that in exchange for an exclusivity agreement, ASIC provided "kickbacks" to Caliber in the form of "unearned 'commissions' . . . for work purportedly performed to procure individual policies[,]" "'expense reimbursements' allegedly paid to reimburse Caliber for expenses it incurred in the placement of the force-placed insurance coverage[,]" "payments of illusory reinsurance premiums that carr[ied] no commensurate transfer of risk[,]" and "free or below-cost" mortgage services; and that the "[d]efendants attempt[ed] to disguise the kickbacks as legitimate by characterizing them as income earned by Caliber when, in fact, they [were] unearned, unlawful profits." Fowler Compl. ¶ 3.

In each case, the defendants moved to dismiss the complaint on the grounds that the plaintiffs' claims were barred by the filed-rate doctrine or, in the alternative, that each claim suffered from at least one independent defect. On April 25, 2016, citing the filed-rate doctrine, the district court dismissed Patel's and Wilson's complaint with prejudice pursuant to Rule 12(b)(6). *Patel v. Specialized Loan Servicing, LLC*, 183 F. Supp. 3d 1238, 1244 (S.D. Fla. 2016). Then, on July 8, 2016, the court dismissed Fowler's, Yambo-Gonzalez's, and Keller's complaint

with prejudice on the same ground. Two months later, the district court issued an amended order in response to a request for clarification from the plaintiffs. *Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1326 n.1 (S.D. Fla. 2016).

Both sets of plaintiffs filed timely appeals. Citing the cases' similarities—namely, that they were filed on the same day in the same court by the same counsel, have a common co-defendant, and involve nearly identical claims, defenses, and issues—ASIC and SLS filed a Motion to Consolidate Appeals for Oral Argument. On December 19, 2016, we granted that motion.

II

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. *Allen v. USAA Cas. Ins. Co.,* 790 F.3d 1274, 1277 (11th Cir. 2015). In doing so, we "accept[] the [factual] allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009). However, while we are required to accept all factual allegations as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

To survive a Rule 12(b)(6) motion to dismiss, a complaint need not provide detailed factual allegations. *Twombly*, 550 U.S. at 555. However, dismissal is appropriate "where it is clear [that] the plaintiff can prove no set of facts in support of the claims in the complaint." *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). For this reason, a court may dismiss a complaint pursuant to Rule 12(b)(6) on a dispositive issue of law. *Ibid.*

III

A

The filed-rate doctrine "forbids a regulated entity [from] charg[ing] rates for its services other than those properly filed with the appropriate . . . regulatory authority." *Hill*, 364 F.3d at 1315 (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). As a result, "[w]here the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate[.]'" *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (quoting *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951)). This holds true even "where a regulated entity allegedly has defrauded an administrative agency to obtain approval of a filed rate" or where the rate filed with the agency resulted from price-fixing. *Taffet*, 967 F.2d at 1489, 1494–95. Furthermore, "the filed[-

13

]rate doctrine applies whether the rate in question is approved by a federal or state agency." *Id.* at 1494 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir. 1992)).

Two rationales underlie the doctrine. The first, which is known as the "nondiscrimination principle," is that all rate-payers should be charged the same rate for the regulated entity's service. *See Hill*, 364 F.3d at 1316. The second, which is termed the "nonjusticiability principle," is that duly-empowered administrative agencies should have exclusive say over the rates charged by regulated entities because agencies are more competent than the courts at the rate-making process. *Ibid*. These two principles are "applied strictly," meaning that the filed-rate doctrine bars "a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand . . . is *implicated* by the cause of action the plaintiff seeks to pursue." *Ibid.* (emphasis added) (quoting *Marcus*, 138 F.3d at 59).

The filed-rate doctrine therefore precludes two types of suits. First, and most obviously, direct challenges to a filed rate are barred because, if successful, they necessarily violate the nonjusticiability principle. *See Hill*, 364 F.3d at 1317. Second, facially-neutral challenges—i.e., any cause of action that is not worded as a challenge to the rate itself—are barred when an award of damages "would,

14

effectively, change the rate paid by the customer-[plaintiff] to one below the filed rate paid by other customers" or "would, in effect, result in a judicial determination of the reasonableness of that rate[.]" *Id*. at 1316–17.

An important, though heretofore overlooked, corollary of the nondiscrimination and nonjusticiability principles is that the filed-rate doctrine's applicability does not turn on whether the plaintiff is a rate-payer. On the one hand, because the nonjusticiability principle does not rest on the plaintiff's identity—it bars *any* suit that would challenge the rate-making authority of the appropriate regulatory body—it can preclude causes of action brought by non-rate-payers. Even non-customers, for instance, cannot directly challenge a filed rate. On the other hand, even when the plaintiff is a rate-payer, the nonjusticiability and nondiscrimination principles are not always implicated. Were a rate-payer to challenge a regulated entity's practice of giving other, favored rate-payers a rebate, such a challenge would not necessarily involve the courts in rate-making; nor would it necessarily grant a subgroup of customers a discount on their *rate*. *See, e.g.*, *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012) (holding that filed-rate doctrine does not bar rate-payers from challenging payments allegedly made by regulated entity to large customers in exchange for their withdrawing objections to proposed rate change, where defendants presented

15

no evidence that side agreements were filed with any agency).  Rather, for these principles to be implicated, the suit must challenge, either directly or indirectly, some component of the approved rate.

This observation disposes of two points of confusion that attend challenges to FPI practices such as those present here, i.e., where an intermediary passes the cost of regulator-approved rates on to a third party.  First, it demonstrates that we need not debate whether the FPI transaction consists of two, separate transactions—first, between the insurers and servicers and, second, between the servicers and the borrowers—or a single "A-to-B-to-C" transaction, where the servicers are merely a conduit between the insurers and the borrowers.  Such a distinction matters only if the filed-rate doctrine's applicability turns on a plaintiff's status as a rate-payer.[6]  Second, it shows that the size of the alleged "kickback" is irrelevant to the issue before us.  Even were an insurer to return 100 percent of the approved premium to the servicer, the question would remain whether such a payment was a component of the rate filed with regulators.  If so,

---

[6] In *Rothstein*, the Second Circuit gives an alternative reason to view "[t]he distinction between an 'A-to-B' transaction and an 'A-to-B-to-C' transaction [as being] especially immaterial in the [F]PI context[.]"  794 F.3d at 265.  Specifically, the Second Circuit notes that "[F]PI travels invariably 'A-to-B-to-C'" as "[t]he purpose of [F]PI is to enforce the borrower's contractual obligation to maintain adequate hazard insurance; the lender [or servicer] acts on the borrower's behalf and in the borrower's place to 'force place' a transaction that the borrower should have entered."  *Ibid.*

16

the nonjusticiability doctrine precludes the cause of action.  At best, then, the size of a "kickback" can only provide circumstantial evidence that the payment was not a component of the filed rate.[7]

Also overlooked is the fact that while the nondiscrimination principle is a rationale for the filed-rate doctrine, it does not determine the doctrine's applicability.  If the plaintiff is not a rate-payer, then an award of damages cannot effectively change the rate paid by a subset of rate-payers.  As such, because the nondiscrimination principle cannot be implicated, the nonjusticiability principle alone determines whether the filed-rate doctrine applies to such cases.  At the same time, the nondiscrimination principle does not bar all suits that would lead to an award of damages to a rate-payer.  A utility customer, for instance, is not barred from suing for damages done to his property by the utility company's employees.  Thus, for the nondiscrimination principle to apply, the cause of action must have a connection with the rate of service.    However, when that occurs, the nonjusticiability principle is also necessarily implicated.    Thus, whenever the nondiscrimination principle is violated, so is the nonjusticiability principle.

---

[7] Because regulators are unlikely to approve a 100-percent "kickback," its presence would suggest that it was not a component of the filed rate.  However, if it were a component of the filed rate, the proper recourse for plaintiffs would be through their state's or the federal regulatory structures.  *See, e.g.*, *Taffet*, 967 F.2d at 1493–94.  Notably, the size of the alleged kickbacks here was only a portion of the borrowers' FPI charges.

A simple framework therefore emerges for determining whether the filed-rate doctrine bars a cause of action. First, we must examine whether the complaint facially attacks a filed rate. Here, this amounts to a determination of whether the plaintiffs worded their complaints as a challenge to ASIC's rate for force-placed insurance. If they did, then their causes of action are barred. Second, if the complaint does not facially attack a filed rate, we must ask whether it implicates the nonjusticiability principle by challenging the components of a filed rate. Stated differently, we must determine whether the cause of action effectively contests the inclusion of certain charges in (or the omission of certain discounts from) a rate filed with the appropriate administrative agency. In this case, this requires us to investigate whether ASIC's FPI rates include an allowance for commissions and similar costs. Only if the answer to *both* inquiries is "no" is the filed-rate doctrine inapplicable.

### B

Before proceeding to that inquiry, however, we pause to address the dissent's claim that we should not apply the filed-rate doctrine. Despite some suggestions to the contrary, *see* Dissent at 29 ("The majority … now confidently decrees that the federal filed rate doctrine is the governing rule [in Florida and Pennsylvania]"), the dissent could not mean that the filed-rate doctrine is a federal

18

doctrine that only applies to rates approved by federal regulatory agencies. Such a view has already been rejected *et dixit magna voce* by a unanimous en banc panel of this court. *See Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate . . . .' This principle . . . applies with equal force . . . whether the rate at issue has been set by a state rate-making authority or a federal one." (first alteration in original) (citing *Montana-Dakota Utils. Co.*, 341 U.S. at 251)). Nor is this the only circuit to hold as much. *See, e.g., Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015) ("The [filed-rate] doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators."); *see also In re N.J. Title Ins. Litig.*, 683 F.3d 451, 453 (3d Cir. 2012) (affirming the district court's dismissal of "state and federal antitrust claims against numerous New Jersey title insurance companies" on the grounds that suits were based on rates that had been filed with New Jersey's Department of Banking and Insurance and, thus, were barred by the filed-rate doctrine); *H.J. Inc.*, 954 F.2d at 494 ("[T]he rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency"). Presumably, then, the dissent faults this opinion for not analyzing state law to determine whether the "legislature[s of Florida and

19

Pennsylvania] ha[ve] conferred power upon an administrative agency to determine the reasonableness of [the] rate [in question]," *Taffet*, 967 F.2d at 1494.

Fair enough.  For that reason, we now largely reproduce the reasoning that the district court offered in *Fowler*, 277 F. Supp. 3d at 1338–39.  Before doing so, however, we begin with a brief digression—namely, a quick overview of this court's discussion in *Taffet* of Alabama's and Georgia's utility rate-making regimes—to help frame the ensuing *Erie* guess, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

In *Taffet*, we concluded that the filed-rate doctrine existed as to those state regulatory schemes due, in large part, to the legislatures' having established "elaborate administrative schemes to ensure that rates for electricity are just and reasonable for the affected utilities and for the public."  967 F.2d at 1490.  With respect to Alabama's regime, we noted that the legislature had delegated to the state's public service commission ("PSC") the authority to set electric power rates and to determine what constitutes a fair rate of return; that a utility that wished to change an existing rate had to file a new rate schedule with the PSC; that upon written complaint by a rate-payer, the PSC had the duty to investigate the reasonableness of the challenged rate; that the PSC's disposition of the complaint could be appealed to the Alabama Supreme Court, but that the court's inquiry was

20

ordinarily limited to ensuring that there was evidence to support the PSC's determination; and that Alabama courts were not permitted to substitute their judgment for that of the PSC. *Id.* at 1490–91. We further observed that Alabama's scheme left open a means for the PSC to compensate those who had paid excess rates in the past without undermining the PSC's authority to set reasonable rates. *Id.* at 1492–93. For similar reasons, we concluded that the filed-rate doctrine also applied to Georgia's scheme. *Id.* at 1491–94.

Florida has enacted a similar regime with respect to insurance rates. Pursuant to Fla. Stat. § 627.062, insurers "must" file with the Office of Insurance Regulation ("OIR") a "copy of rates, rating schedules, [and] rating manuals," among other things. *Id.* § 627.062(2)(a). The OIR is empowered to review these filings to ensure that they are not "excessive, inadequate, or unfairly discriminatory[,]" where "excessive" is defined as, *inter alia*, "likely to produce a profit . . . which is unreasonably high in relation to the risk involved in the class of business or if expenses are unreasonably high in relation to services rendered." *Id.* § 627.062(2)(b), (e). Where the OIR determines that a rate or rate change is excessive, inadequate, or unfairly discriminatory, it is directed to disapprove the rate and to compensate the relevant policyholders, *id.* § 627.062(h) ("The office shall [] order . . . that premiums charged each policyholder constituting that portion

21

of the rate above that which was actuarially justified be returned to the policyholder[.]"), or, under certain circumstances, to direct the insurer to correct the noncompliance, including by adjusting the premium, *id.* § 627.371(2). Furthermore, whenever an insurer wishes to change a rate, it must notify the OIR within 30 days after the effective date of the change, *id.* § 627.062(2)(a), after which the office reviews the rate to ensure that it is not "excessive, inadequate, or unfairly discriminatory[,]" *Nat'l Council on Comp. Ins. v. Fee*, 219 So. 3d 172, 174 (Fla. Dist. Ct. App. 2017) (quoting Fla. Stat. § 627.062(3)(b)).

Finally, as with Alabama's utility rate-making regime, in Florida, upon written complaint and after petitioning the insurer, "[*a*]*ny person aggrieved* by any rate charged, rating plan, [or] rating system . . . followed or adopted by an insurer" may request OIR review.  Fla. Stat. § 627.371(1) (emphasis added); *cf. Int'l Patrol & Detective Agency Co. v. Aetna Cas. & Sur. Co.*, 419 So. 2d 323, 324 (Fla. 1982). Should such an individual wish to challenge an OIR decision, he or she can appeal that decision to the Florida District Court of Appeal, *see State Farm Mut. Auto. v. Gibbons*, 860 So. 2d 1050, 1052 (Fla. Dist. Ct. App. 2003) (stating that once administrative review pursuant to Fla. Stat. § 627.371 is complete, "the exclusive jurisdiction for judicial review is the District Court of Appeal"), "but the court shall not substitute its judgment for that of the agency on an issue of discretion[,]"

22

Fla. Stat. § 120.68(7)(e); *cf. Nationwide Mut. Ins. Co. v. Williams*, 188 So. 2d 368, 372 (Fla. Dist. Ct. App. 1966) ("This court is not and should not be burdened with the responsibility of rate-making.    Insurance rate-making is a technical, complicated, and involved procedure.  It is not an exact science.  Judgment based upon a thorough knowledge of the problem must be applied.").

While such data points may not allow us to say with certainty that the appellate courts of Florida will hold that the filed-rate doctrine exists as to the regulatory scheme in question, they are enough to make an educated guess, which is all that *Erie* requires.  And for similar reasons, we can make an educated guess regarding the determination of the appellate courts of Pennsylvania.  *See* 40 Pa. Stat. Ann. § 710-6(a) ("Every insurer making a filing with the commissioner . . . *shall* file every manual of classifications, rules and rates, every rating plan *and every modification* of a manual of classifications, rules and rates and a rating plan which it proposes to use[.]" (emphasis added)); *see also id.* § 710-7(b) (permitting commissioner to disapprove rates that are "excessive, inadequate, or unfairly discriminatory"); *Id.* § 710-11(e) (permitting the commissioner to suspend a previously approved rate if it subsequently deems, *inter alia*, the rate to be excessive); 1 Pa. Code § 35.9 ("A person complaining of anything done or omitted to be done by a person subject to the jurisdiction of an agency, in violation of a

23

statute or regulation administered or issued by the agency may file a complaint with the agency").

C

Although the plaintiffs assert on appeal that they are not challenging the reasonableness of ASIC's rates, the complaints belie this claim. As such, their causes of action fail at the first stage of the analysis. The most obvious basis for this conclusion is the fact that the plaintiffs repeatedly state that they are challenging ASIC's premiums. In a section of the complaints titled "The Force-Placed Insurance Scheme," they characterize the servicers as being "incentivized to purchase and force place insurance coverage *with artificially inflated premiums*[.]" Patel Compl. ¶ 36 (emphasis added); Fowler Compl. ¶ 35 (emphasis added); *see also* Patel Compl. ¶¶ 98(b), 111; Fowler Compl. ¶ 111(b). Elsewhere, they describe themselves as "suffer[ing] damages in the form of *unreasonably high* force-placed insurance *premiums*[.]" Patel Compl. ¶ 156 (emphasis added); Fowler Compl. ¶ 169 (emphasis added); *see also* Patel Compl. ¶¶ 150, 162. Finally, the plaintiffs make clear that they are objecting to ASIC's—not just SLS's—practice of "bundl[ing] the cost [of "kickbacks"] into the amounts charged for insurance coverage." Patel Compl. ¶ 5; *see also* Patel Compl. ¶¶ 38, 120; Fowler Compl. ¶¶ 37, 115, 124, 125, 150, 166(l). The plain language of the

24

complaints therefore shows that the plaintiffs are challenging the reasonableness of ASIC's premiums; and since these premiums are based upon rates filed with state regulators, plaintiffs are directly attacking those rates as being unreasonable as well.

That the plaintiffs are challenging ASIC's rates is further attested to by their allegation that the defendants have "manipulate[d] the force-placed insurance market" to "artificially inflate the amounts . . . charge[d] to borrowers" for force-placed insurance.  Patel Compl. ¶ 26; Fowler Compl. ¶ 25.  Since ASIC is the provider in the FPI market, the charge of price manipulation necessarily attacks ASIC's premiums.  Given, moreover, that the plaintiffs repeatedly use the language of market manipulation to characterize their causes of action, Patel Compl. ¶¶ 14, 47, 75(e), 98(a), 140; Fowler Compl. ¶¶ 12, 45, 89(e), 111(a), 153(i), we cannot avoid the conclusion that they are directly challenging the rates that ASIC has filed with state regulators.

Their complaints therefore contain textbook examples of the sort of claims that we have previously held are barred by the nonjusticiability principle.  In *Taffet*, for instance, we held that utility customers in Alabama and Georgia could not sue utilities for damages measured as the difference between the filed rate and the rate that would have prevailed absent the providers' fraudulent behavior.  967

25

F.2d at 1491.   Permitting such a cause of action, we stated, "would disrupt greatly the states' regulatory schemes" because for the plaintiff-customers to prevail, a "trial judge, or a jury, would have to determine what rate should have been set by" the states' regulatory bodies.  *Ibid.*  Since this would effectively empower the trial court to set a new rate, the nonjusticiability principle was violated.  *Ibid.*  And as we also noted, there is no fraud exception to the filed-rate doctrine, *id.* at 1494–95, defeating the plaintiffs' attempt at circumventing the rule by alleging a fraudulent kickback scheme.

We reached the same conclusion in *Hill*, where a telecommunications customer sought monetary damages from a service provider for its billing practices, specifically, its representation of a given charge as a recoupment of a mandatory federal fee when, in fact, the charge exceeded the required fee.  364 F.3d at 1311–12.  Because that charge had been filed with federal regulators, we concluded that a decision in the plaintiff's favor would amount to a retroactive determination of a filed rate's reasonableness and was thus barred.  *Id.* at 1317.  Likewise, for the plaintiffs to prevail in this case, a trial court would have to determine that ASIC's rates should have been lower than what was filed with regulators in Florida and Pennsylvania.

26

Because the plaintiffs should be understood as meaning what they say, we find that they have challenged ASIC's filed rate.  As such, there can be no doubt that their causes of action are barred by the filed-rate doctrine.[8]

---

[8] Even were we to proceed to the second stage of the examination, it is unlikely that we would reverse the district courts' grants of the defendants' motions to dismiss.  To see why, it helps to briefly discuss *Rothstein*.

In *Rothstein*, the Second Circuit held that the filed-rate doctrine barred a suit by mortgagors who claimed that they had been "fraudulently overbilled [for FPI] because the rates they were charged did not reflect secret 'rebates' and 'kickbacks' that [the loan servicer] received from [the insurer] through [the insurer's] affiliate[.]"  794 F.3d at 259.  In reaching that conclusion, the court noted that:

> The theory behind the claims is that Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by regulators), instead of lower rates net of the value of loan tracking services provided by [the insurer's affiliate]. That theory can succeed only if the arrangement [between the loan servicer and the insurer's affiliate] should have been treated as part and parcel of the [F]PI transaction and *reflected in the* [*F*]*PI rates.*

*Ibid.* (footnote omitted).  Since under the nonjusticability principle, "it is squarely for the regulators to say what should or should not be included in a filed rate[,]" the court concluded that the claims were barred.  *Id.* at 262.  Admittedly, unlike this case, *Rothstein* only dealt with claims against the insurer and the insurer's affiliate, *id.* at 259; nevertheless, because the Plaintiffs' claims here rely on the same underlying theory, *Rothstein*'s reasoning continues to persuade us.

The Plaintiffs insist, however, that we should instead follow *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009), which they contend is better reasoned and supports reversal of the district court opinions.  Patel Br. 17; Fowler Br. 17.  In *Alston*, the Third Circuit "briefly address[ed]" the question of whether the filed-rate doctrine barred a suit brought pursuant to Section 8(d)(2) of the Real Estate Settlement Procedures Act of 1974 ("RESPA").  585 F.3d at 759.  And according to the dissent, the Third Circuit "conclude[ed] that the plaintiffs' kickback-scheme claims did not concern a filed rate, and thus it was 'absolutely clear that the filed rate doctrine simply d[id] not apply.'"  *See* Dissent at 56–57 (alterations in original) (quoting *Alston*, 585 F.3d at 765).

It is far from certain, however, that this is what *Alston* actually held.  While it is true that the Third Circuit stated that it is "absolutely clear that the filed rate doctrine simply does not apply here[,]" immediately preceding that statement, it said, "[i]t goes without saying that if we were to find that the filed rate doctrine bars plaintiffs' claims, we would effectively be excluding PMI from the reach of RESPA, *a result plainly unintended by Congress*."  *Id.* at 764 (emphasis added).  Given that the filed-rate doctrine rests upon the principle that "[w]here the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the

27

IV

For the reasons noted above, this case triggers an application of the filed-rate doctrine. We therefore **AFFIRM** the district courts' grants of the defendants' motions to dismiss for failure to state a claim. We **DENY** the October 24, 2016 motion for judicial notice by defendants-appellees Specialized Loan Servicing LLC and American Security Insurance Company as moot.

---

rate-payer 'can claim no rate as a legal right that is other than the filed rate[,]'" *see Taffet*, 967 F.2d at 1494 (quoting *Montana-Dakota Utils. Co.*, 341 U.S. at 251), *Alston* seems to be making the rather unremarkable point that the reach of the filed-rate doctrine can be circumscribed by legislation that confers to individuals a private right of action. Since nothing akin to RESPA's remedial provision exists here, *Alston* is not on point.

28

JORDAN, Circuit Judge, dissenting:

The federal filed rate doctrine, a creature of federal common law derived from various federal statutes, has been around since 1907. Despite its existence for over 100 years, Pennsylvania and Florida have so far not adopted it. The majority, without seeking guidance from the supreme courts of Pennsylvania or Florida, now confidently decrees that the federal filed rate doctrine is the governing rule in these two states. The majority also expands the filed rate doctrine to also bar claims against anyone whose contract seemingly concerns a filed rate. The majority then applies its sweeping rule to parties which have not filed any rates with state regulators.

I respectfully disagree with the majority's analysis and holding. First, I would certify this case to the supreme courts of Pennsylvania and Florida and ask whether they have adopted the filed rate doctrine in some form. Second, assuming that the filed rate doctrine applies in its unadulterated federal form, it does not bar a breach-of-contract claim that does not challenge a filed rate. Third, the filed rate doctrine does not—and should not—extend to lenders who are not regulated by rate-setting agencies, are not required to file rates, and are not sellers of filed rates.

29

## I

The Supreme Court derived the federal filed rate doctrine from federal statutory and regulatory schemes.  This case does not involve any such federal schemes; it instead concerns the regulatory systems of Pennsylvania and Florida.  These two states require insurers to file insurance premiums (i.e., rates) with the appropriate state regulatory agencies.  Because no federal law mandates these filings and no federal agency regulates these rates, we must look to the laws of Pennsylvania and Florida to determine whether something akin to the federal filed rate doctrine governs in these states.

## A

The federal filed rate doctrine is a court-made rule crafted by the Supreme Court in the early 1900s.  In one of the seminal cases, *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 448 (1907), the Court barred a plaintiff from extracting a lower rate through litigation to avoid paying the higher rate set by a federal agency.  The case turned on the Interstate Commerce Act.  One of the ICA's goals was to ensure reasonable rates for railroad customers, so it required railroads to file proposed rates with the Interstate Commerce Commission and then to charge *only* those filed rates, assuming the ICC approved the rates as "reasonable."  *Id.*  But some customers were not satisfied that the ICC's approved

30

rates were low enough, so they sued and demanded that the railroads charge lower rates. *Id.* at 430. The Court read the rate-filing provisions of the ICA to impliedly bar such suits. It reasoned that Congress meant the ICA to ensure "reasonable" rates only through the rate-setting process itself. *Id.* at 448.

The Supreme Court has applied the filed rate doctrine to other claims and industries regulated under the ICA. *See, e.g.*, *Louisville & N. R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915); *Keogh v. Chi. & N.W. Ry. Co.*, 260 U.S. 156, 160–63 (1922). And it has expanded the federal filed rate doctrine to other federal statutory schemes and industries, including utilities, insurers, and common carriers. *See, e.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 573 (1981) (rates filed with the Federal Energy Regulatory Commission pursuant to the Natural Gas Act); *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 221–28 (1998) (rates filed with the Federal Communications Commission pursuant to the Communications Act of 1934).

These cases and others confirm that the Supreme Court has consistently treated questions about the existence and scope of the doctrine as a question of federal statutory interpretation. *See, e.g.*, *Cent. Office. Tel.*, 524 U.S. at 222–24 (concluding that the filed rate doctrine applies to the Federal Communications Act because its relevant provisions were modeled on those in the ICA); *MCI*

31

*Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 234 (1994) ("[T]here is considerable debate in other forums about the wisdom of the filed rate doctrine . . . But our estimations, and the Commission's estimations, of desirable policy cannot alter the meaning of the [F]ederal Communications Act of 1934. For better or worse, the Act establishes a rate-regulation, filed-tariff system for common-carrier communications.") (citations and quotation marks omitted); *T.I.M.E. Inc. v. United States*, 359 U.S. 464, 468–70 (1959) (noting that the issue is one of "statutory interpretation," engaging in a lengthy analysis of Congress' intent, and ultimately concluding that "[t]he structure and history" of the relevant federal act determined whether a party to the regulated transaction could challenge the reasonableness of past rates). And until now, we have applied this same approach. *See, e.g.*, *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1311–12, 1315 (11th Cir. 2004) (observing that the federal filed rate doctrine applies to rates approved under the Federal Communications Act); *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 64 F.3d 614, 616 (11th Cir. 1995) (citing *Ark. La. Gas Co.*, 453 U.S. at 571, for the proposition that the federal filed rate doctrine applies to rates approved by the Federal Power Commission/Federal Energy Regulatory Commission).

In short, for the federal filed rate doctrine to apply, it must be tied to a federal statute creating a federal regulatory scheme. When the regulatory scheme

32

is instead created by a state, we must look to that state's law to figure out whether a state-law filed rate doctrine exists.

## B

To determine whether a filed rate doctrine exists under state law, we first ask whether the state has adopted or disclaimed the filed rate doctrine. Barring an explicit holding from the state courts, we must either certify the question to the appropriate state supreme court or review the state's regulatory scheme and make an *Erie* guess, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), as to whether a filed rate doctrine exists under state law. What we cannot do is impose the federal filed rate doctrine on a state because its statutes appear similar to federal laws.

Our decision in *Taffet v. Southern Co*., 967 F.2d 1483 (11th Cir. 1992) (en banc), exemplifies this methodology. There, we addressed whether electricity customers who sought to bring federal RICO claims against power companies for rates approved by state regulators in Alabama and Georgia. We analyzed those states' regulatory schemes and case law and concluded that those states appeared to have their own filed rate doctrines. *See id*. at 1490–94.

*Taffet* is not unique. The vast majority of federal and state courts look to state law to decide whether state regulatory schemes warrant a filed rate doctrine of some kind. *See, e.g.*, *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 763–64 (3d

33

Cir. 2009); *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507–10 (5th Cir. 2005); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992–93 (9th Cir. 2000); *Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 735–36 (S.D. Iowa 2007); *Anzinger v. Ill. State Med. Inter-Ins. Exch.*, 494 N.E.2d 655, 656–58 (Ill. App. Ct. 1986); *Commwealth ex rel. Chandler v. Anthem Ins. Cos., Inc.*, 8 S.W.3d 48, 52–53 (Ky. Ct. App. 1999); *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 312–16 (Minn. 2006); *Williams v. Union Fid. Life Ins. Co.*, 123 P.3d 213, 219 (Mont. 2005); *Richardson v. Standard Guar. Ins. Co.*, 853 A.2d 955, 961–63 (N.J. Super. Ct. App. Div. 2004); *N.C. Steel, Inc. v. Nat'l Council on Comp. Ins.*, 496 S.E.2d 369, 372–73 (N.C. 1998); *Edge v. State Farm Mut. Auto. Ins. Co.*, 623 S.E.2d 387, 390–92 (S.C. 2005).  There are some outliers, but they do not explain—much less justify—their approach.  *See, e.g.*, *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18–22 (2d Cir. 1994).

The majority cites several cases in an attempt to show that a state law analysis is unnecessary.  But those cases provide the majority with little cover. First, in *In re N.J. Title Insurance Litigation*, 683 F.3d 451, 460 (3d Cir. 2012), the Third Circuit explicitly relied on New Jersey precedent analyzing the state's statutory framework and "conclud[ed] that 'the filed rate doctrine should be applied.'"  Second, in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485,

34

494 (8th Cir. 1992), the Eighth Circuit failed to engage in any analysis of the issue, choosing instead to summarily conclude that "[a]lthough little case law exists on this question, we see no reason to distinguish between rates promulgated by state and federal agencies."  The majority is correct that the Second Circuit did not analyze state law in *Rothstein v. Balboa Insurance Co.*, 794 F.3d 256, 261 (2d Cir. 2015), but *Rothstein* does not explain why its approach is sound.  We should not exacerbate the Second Circuit's error by importing it into our law, especially when doing so would require ignoring the sound analysis in a unanimous opinion by the en banc Eleventh Circuit in *Taffet*.

The Rules of Decision Act, in language essentially unchanged since its original enactment in 1789, provides that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."  28 U.S.C. § 1652. Absent a contrary rule in the U.S. Constitution, federal law, or a federal treaty, "the law to be applied in any case is the law of the state . . . .  There is no federal general common law."  *Erie*, 304 U.S. at 78.  *See also Mid-Continent Cas. Co. v. Am. Pride Bldg. Co.*, 601 F.3d 1143, 1148 (11th Cir. 2010) (applying Florida law to a case regarding an insurer's "legal duties and obligations" because the issue

35

was "not governed by the Constitution or treaties of the United States or Acts of Congress").

Federal common law does exist in areas involving "'uniquely federal interests'" that "are . . . committed by the Constitution and laws of the United States to federal control." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (citing cases).  But I fail to see how a state-law breach-of-contract claim against a private party that contracted with a state-regulated entity somehow touches on those matters committed to federal control, such as the country's foreign relations, the liability and immunity of federal officials, or admiralty law.  The same goes for an affirmative defense based on a state regulatory scheme.  *See id.* at 504–06; *Texas Inds., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640–41 (1981).  Permitting the states to fashion rules for their own state agencies in this context does not create any "significant conflict between some federal policy or interest and the use of state law" to justify overriding those state rules.  *See Wallis v. Pan Am. Petrol. Co.*, 384 U.S. 63, 68 (1966); Richard H. Fallon, Jr., John F. Manning et al., Hart and Wechsler's The Federal Courts and the Federal System 646–49, 675 (7th ed. 2015).

## C

The majority acknowledges this problem, but fails to grapple with its significance. It tacks onto its federal analysis a reference to the regulatory schemes in Pennsylvania and Florida and concludes that there is "enough to make an educated guess" that these states have adopted a filed rate doctrine. Maj. Op. at 23. I disagree.

As the defendants admit, the Pennsylvania and Florida state courts have never said anything about the filed rate doctrine: "Neither Florida's nor Pennsylvania's highest court has decided whether the filed-rate doctrine bars claims like plaintiffs'. Nor have either state's intermediate appellate courts squarely addressed the issue." *Fowler* Caliber Br. at 16. Given this silence, the majority's "educated guess" is nothing more than a hopeful shot in the dark.

The majority cites several cases from Florida, but not one adopted or even mentioned the filed rate doctrine. *See Nat'l Council on Comp. Ins. v. Fee*, 219 So. 3d 172, 175 (Fla. 1st DCA 2017); *Int'l Patrol & Detective Agency Co. v. Aetna Cas. & Sur. Co.*, 419 So. 2d 323, 324 (Fla. 1982); *Nationwide Mut. Ins. Co. v. Williams*, 188 So. 2d 368, 372 (Fla. 1st DCA 1966). I therefore fail to see how they are helpful.

37

The majority fares no better in Pennsylvania. The sole state appellate decision cited by the parties that comes close to being relevant is *Petty v. Insurance Department*, 878 A.2d 942, 946–47 (Pa. Commw. Ct. 2005). There, the court relied on its earlier decision in *Ciamaichelo v. Independence Blue Cross*, 814 A.2d 800 (Pa. Commw. Ct. 2002), to justify applying a state filed rate doctrine to bar claims of nonprofit hospital plan subscribers "for what [they] alleged to be the [insurance plans'] improper maintenance of excess reserve[ funds]." *Petty*, 878 A.2d at 944. Significantly, however, the Supreme Court of Pennsylvania later reversed *Ciamaichelo*, holding that the complaint did "not allege a rate injury claim" *and* explicitly declining to "address whether the filed-rate doctrine would have applied in this context." *Ciamaichelo v. Independence Blue Cross*, 909 A.2d 1211, 1218 & n.8 (Pa. 2006). As a result, *Petty* is no longer a reliable indicator of Pennsylvania law.

My own search reveals only one other potentially relevant Pennsylvania state court case, an unpublished opinion from a Pennsylvania trial court. In *Milkman v. American Travellers Life Ins. Co.*, 2002 WL 778272 (Pa. Com. Pl. Apr.1, 2002), the court noted that "the Plaintiff's claims *may* be subject to the filed rate doctrine." *Id.* at *14 (emphasis added). It did not apply the doctrine, but

38

simply noted its possible existence as a reason for the court to accept a settlement between the parties. *Id.* at \*14–15. And it cited no Pennsylvania cases for support.

If we are looking for help as to Pennsylvania law, we should consider the Third Circuit's decision in *Alston*, 585 F.3d at 764–65, which refused to apply the federal filed rate doctrine. Although *Alston* did not definitely resolve whether Pennsylvania has adopted something akin to the federal filed rate doctrine in every context, as I discuss in more depth later, at the very least it demonstrates that the robust federal version the majority imposes here is inappropriate.[1]

We should pay particular attention to *Alston* because Pennsylvania is within the Third Circuit. Federal courts have long recognized that they should give some deference to the decisions of other federal courts deciding the law of a state within their respective circuits. *See MacGregor v. State Mut. Life Assur. Co. of Worcester, Mass.*, 315 U.S. 280, 281 (1942) (leaving "undisturbed the interpretation placed upon purely local law by a Michigan federal judge of long experience and by three circuit judges whose circuit includes Michigan" because there was "[n]o decision of the Supreme Court of Michigan" touching on the

---

[1] A district court in the Eastern District of Pennsylvania decided, three months before *Alston*, that the filed rate doctrine barred federal antitrust claims against an insurer who filed rates with the relevant Pennsylvania agency. *See In re Penn. Title Ins. Antitrust Litig.* 648 F. Supp. 2d 663, 672-87 (E.D. Pa. 2009). *Alston* may have effectively overruled *Pennsylvania Title*, but even if it did not, the conflict between these two federal decisions demonstrates that there is an open question whether and in what form Pennsylvania applies the filed rate doctrine.

issue); *Bishop v. Wood*, 426 U.S. 341, 346 n.10 (1976) (giving "great deference" to federal judges' interpretations of the laws of the state in which they sit); *Westinghouse Elec. Supply Co. v. Wesley Const. Co.*, 414 F.2d 1280, 1281 n.1 (5th Cir. 1969) (same). *See also Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 125–26 (D.C. Cir. 1986) (noting that when the court of appeals "has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always") (citation and quotation marks omitted); *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 279 (2d Cir. 1981) (explaining that "conclusive deference" should be given to "ruling[s] by a [federal] court of appeals deciding the law of a state within its circuit").

The majority disregards this lack of state precedent, sidesteps *Alston*, and concludes that the regulatory systems Pennsylvania and Florida have established are alike enough to those in *Taffet* to warrant imposing the federal filed rate doctrine. But we should not be so quick to think that any similar state regulatory system demands the adoption of the filed rate doctrine in its federal form.

The federal filed rate doctrine is not without its critics, as the Supreme Court has noted. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417–23 (1986). The Court in *Square D* drew on the opinion below in the

Second Circuit, written by Judge Friendly. He noted several criticisms of the robust federal filed rate doctrine adopted in *Abilene Cotton* and *Keogh*. For example, he argued that class actions had undermined one of the key policy reasons for the doctrine—to ensure equality among ratepayers—because most ratepayers can have their grievances addressed equally in a single action. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1352 (2d Cir. 1985). Moreover, trends toward deregulation have undermined another basis for the doctrine, the protection of rates heavily monitored by regulatory agencies. These schemes rely "on competition rather than regulation to insure the reasonableness of . . . rates" so that "[e]xposing ratemaking to competitive forces," including antitrust and fraud litigation, is "the most significant aspect[] of this deregulation." *Id.* at 1354–55. *See also* Brief for the United States as Amicus Curiae Supporting Petitioners at 7, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986) (arguing that modern developments have "undercut the rationale relied on in *Keogh* and [have] render[ed] that decision obsolete and its continued application anomalous").

For these and other reasons, some state courts have chosen to adopt a narrow filed rate doctrine applicable only to certain rates established by particular state agencies. *See, e.g.*, *Schermer*, 721 N.W.2d at 313, 317 (initially noting that "[t]his

41

court has not [previously] directly decided whether the filed rate doctrine applies to rates established by Minnesota regulatory agencies," and ultimately concluding, after lengthy weighing of various issues, that "the filed rate doctrine applies generally to rates filed with and approved by the [Minnesota Department of Commerce]").  Other state courts have ducked the question or adopted the doctrine only in limited circumstances.  *See, e.g.*, *Qwest Corp. v. Kelly*, 59 P.3d 789, 792 (Ariz. Ct. App. 2002) (noting that "Arizona courts have not yet considered" whether to adopt a "filed rate doctrine," and ultimately deferring the question); *Satellite Sys., Inc. v. Birch Telecom of Okla., Inc.*, 51 P.3d 585, 588 (Okla. 2002) (refusing to decide whether to adopt a state version of the federal filed rate doctrine for tariffs filed with the Oklahoma Corporation Commission, but holding that even if the doctrine were to be adopted it would not bar a claim for common-law fraud).

Some states have chosen to adopt an alternative to the federal filed rate doctrine.  For example, California rejects the filed rate doctrine and allows lawsuits challenging the reasonableness of rates.  *See Cellular Plus, Inc. v. Sup. Ct.*, 18 Cal. Rptr. 2d 308, 318 (Cal. App. 1993) (rejecting, in a challenge to state-regulated cell phone service rates, the contention that a state filed rate doctrine applies: "We . . . are not compelled to follow the *Keogh* and *Square D* rulings . . . [because, among other reasons,] the instant action pertains to the cellular telephone industry

42

and the [state Public Utility Commission's] regulatory authority over providers of such service, whereas *Keogh* and *Square D* dealt with the [federal] ICC's regulatory authority over common carriers"). In Mississippi, claims for breach of fiduciary duty, breach of the implied covenants of good faith and fair dealing, and fraud are not barred by the filed rate doctrine because they derive from the common law. *See Am. Bankers Ins. Co. of Fl. v. Alexander*, 818 So. 2d 1073, 1083 (Miss. 2001). Montana, for its part, holds that the filed rate doctrine does not apply to rates set by a state regulatory agency. *See Williams v. Union Fidelity Life Ins. Co.*, 123 P.3d 213, 219 (Mont. 2005).

Nor is the filed rate doctrine, even in its federal form, necessarily as robust as the majority assumes. Federal courts have long held that claims that touch on regulated entities or rates are not barred by the filed rate doctrine, as long as they do not challenge the reasonableness of the rate. *See Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 820 (2d Cir. 1983) (concluding that the filed rate doctrine was inapplicable to an antitrust challenge that a service connected to the rates was unlawfully charged by the regulated entity because the issue "is not the reasonableness of the interface tariff rate as compared to some other rate that might have been charged, but instead whether the [service] requirement itself was reasonable, i.e., whether there should have been any charge at all"). *See also City*

43

*of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1179 (8th Cir. 1982) (holding that the filed rate doctrine does not bar claims for antitrust damages where plaintiffs do not challenge the reasonableness of rates, but their competitive effect); *Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1472 (5th Cir. 1987) (noting that the filed rate doctrine does not bar courts from addressing breach-of-contract claims based on unconscionability or through fraud because "[b]y setting aside the contracts, the district court would not interfere with the FERC's rate-making powers").

I could go on, but there is no need to. The point is that states can choose, for their own reasons, not to have a filed rate doctrine, or to have one that is much narrower in scope than the federal version. The majority's unwarranted assumption that Pennsylvania and Florida would adopt a full-throated version of the federal filed rate doctrine is not faithful to our notions of federalism. Given the vast variety of approaches available to the states, which function as laboratories in our federal system, *see New State Ice Co. v. Liebmann*, 285 U.S. 262, 387 (1932) (Brandeis, J., dissenting), we cannot blithely assume that anything like the federal filed rate doctrine exists (or will be adopted) in Pennsylvania or Florida. Even if we can assume the doctrine exists in these states, it requires yet another leap to assume that it functions in the same way as its federal counterpart.

44

**D**

We have said that "[w]hen substantial doubt exists about the answer to a material state law question upon which the case turns . . . [we] should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." *Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 761 (11th Cir. 1996). *See also Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (suggesting that certification was "particularly appropriate in view of the novelty of the question and the great unsettlement of Florida law"); *Looney v. Moore*, 861 F.3d 1303, 1314 (11th Cir. 2017) ("Only a state supreme court can provide what we can be assured are 'correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law.") (citation and quotation marks omitted). Certification makes all the more sense where, as here, the issue is one of first impression and involves "policy implications." *See Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 832 F.3d 1318, 1326 (11th Cir. 2016).

Given the dearth of case law in Pennsylvania and Florida, I would certify to the supreme courts of these states two questions: (1) whether they would adopt a filed rate doctrine, and, (2) if so, in what form. *See* Pa. R. App. P. 3341; Fla. Const. art. V, § 3(b)(6). We should not ignore the interests of these states in

establishing their own regulatory schemes by harkening back to the now-discredited days of general federal common law. *See Swift v. Tyson*, 41 U.S. 1, 18–19 (1842).

## II

Inflicting federal strictures on state regulatory systems is not the majority's only error. Even if something like the federal filed rate doctrine applies in Pennsylvania and Florida, there is no reason for it to bar the homeowners' breach-of-contract claims.

## A

At issue here are two distinct contracts: one between the homeowners and the lenders of their mortgages, and one between the lenders and the insurance companies who sold hazard insurance to the lenders. I treat the two actions before us (*Patel* and *Fowler*) as one because the complaints are virtually identical, except for the identities of the lender defendants.

The homeowners mortgaged their property or borrowed money through loans secured by their homes. The lenders are Caliber Home Loans, Inc. and Specialized Loan Servicing, LLC (collectively, "the lenders"), which bought commercial hazard insurance from American Security Insurance Company.

46

The mortgage contracts between the homeowners and the lenders are entirely distinct from the commercial insurance agreements between the lenders and ASIC.  The mortgage contracts give the homeowners a choice to either buy hazard insurance themselves or to reimburse the lender for "the cost" of insurance. *See Fowler* Complaint ¶ 48.[2]

When the homeowners failed to insure their homes, the lenders bought hazard insurance to protect themselves from loss in case the homes were damaged. The lenders purported to pay the price of hazard insurance ASIC submitted in schedules to state insurance regulators in Pennsylvania and Florida.  *See Patel* Appellees' Br. at 7–8; *Fowler* ASIC Br. at 9–10; *Fowler* Caliber Br. at 17–18. These schedules disclose the nominal price of the hazard insurance that ASIC charges every customer, including the lenders.

---

[2] The specific language in the mortgage contracts is:

> **5. Property Insurance**.  . . .
>
> If Borrower fails to maintain any of the [hazard insurance] coverages described above, **Lender may obtain insurance coverage**, at Lender's option and **Borrower's expense**. . . .  Borrower acknowledges that **the cost** of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any **amounts disbursed** by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*Fowler* Complaint ¶ 48 (emphasis added).  *See also id.* ¶¶ 64, 77; *Patel* Complaint ¶¶ 49, 62.

The homeowners claim that the lenders found a way to pay less than this regulated price.  The complaints allege that the lenders engaged in several transactions with ASIC that amounted to kickbacks.  *See, e.g.*, *Fowler* Complaint ¶¶ 3, 6, 25–28, 31–33, 36, 37, 39.  These transactions effectively lowered the amounts the lenders paid for insurance.

The scheme alleged by the homeowners has two components.  First, ASIC paid the lenders commissions that discounted their cost of insurance.  A typical insurance customer might purchase insurance through an independent broker and pay that person a commission.  Here, the "brokers" were in fact affiliated with the lenders themselves, so the commissions effectively discounted the lenders' purchase of insurance.  Second, the lenders induced ASIC to provide other forms of value to retain their business.  For instance, ASIC performed some of the lenders' mortgage-servicing work for less than fair-market value.  The lenders also "sold reinsurance" of the same policies back to ASIC without risk.  The homeowners allege that these and other transactions discounted "the cost" the lenders paid ASIC for insurance, which was significantly lower than the nominal price the lenders supposedly paid.

Nevertheless, the lenders still required the homeowners to reimburse them for the full nominal price, or "the cost," of the force-placed insurance as required

48

by the mortgage contracts. The homeowners contend that because the kickbacks reduced the cost the lenders paid, the amount they must reimburse the lenders should also be reduced. Accordingly, they assert various federal and state-law claims against the lenders, and against ASIC for participating in and benefiting from the purported unlawful scheme.

## B

ASIC and the lenders argue that the filed rate doctrine bars the homeowners' claims because they amount to generalized grievances that ASIC's insurance rates are unreasonably high, and seek only to force the defendants to sell (in ASIC's case) or bill for (in the lenders' case) insurance at lower rates. *See Patel* Appellees' Br. at 12; *Fowler* ASIC Br. at 17; *Fowler* Caliber Br. at 9. But that argument misreads the homeowners' claims. The homeowners assert that, regardless of the insurance rate ASIC charged, the lenders are contractually obligated to charge only the amount of insurance they actually paid. By engaging in side agreements with ASIC for "commissions," "reinsurance," and other kickbacks—transactions that are of course, unregulated—the lenders found a way to discount their insurance costs. Given that the mortgage contracts between the homeowners and the lenders required the lenders to charge the homeowners for only "the cost" of insurance, the lenders breached those contracts by demanding

49

more than the *discounted* cost they paid ASIC. *See, e.g.*, *Patel* Compl. ¶¶ 5, 26, 32, 33, 47, 89.

The majority ignores this theory at the heart of the homeowners' case. The majority concludes, in a reductive characterization of the claims, that they are *wholly* about challenging filed rates. But at the motion to dismiss stage, we must read the facts alleged in the light most favorable to the homeowners, allow the pleading of alternative and inconsistent theories, and keep "the good and leave[] the bad." *Jones v. Bock*, 549 U.S. 199, 221 (2007). *See also Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273–74 (11th Cir. 2009). The majority violates these precepts by construing the federal filed rate doctrine so broadly as to bar claims that have nothing to do with filed rates.

## C

The majority also ignores how the federal filed rate doctrine works in practice. Even if the doctrine applies here, and even if we read the complaints to touch on rates filed with state regulators, the defendants have still failed to demonstrate the facts necessary to invoke the doctrine's protection.

The federal filed rate doctrine is an affirmative defense. *See In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988). *See also E. & J. Gallo*

50

*Winery v. EnCana Corp.*, 503 F.3d 1027, 1039 n.11 (9th Cir. 2007) ("In a number of cases, such as this one, a buyer brings a state law or federal antitrust action against a seller, who in turn raises the filed rate doctrine as an affirmative defense.").  At the motion to dismiss stage, we may dismiss a complaint based on an affirmative defense only "when [the] allegations, on their face"—including any facts established by external documents that the court is permitted to consider— "show that an affirmative defense bars recovery on the claim."  *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).  Because the federal filed rate doctrine can bar a claim "only where there are validly filed rates," *Florida Municipal*, 64 F.3d at 616, the defendant relying on the doctrine must show that a validly filed rate governs the transaction at issue.

*Florida Municipal* exemplifies this requirement.  There, an electricity customer (a municipal agency) wanted to buy certain electricity services—called "network service"—but the utility refused to sell.  *See id*. at 615.  The agency sued, asserting breach of contract and antitrust claims.  The utility countered that the federal filed rate doctrine barred the suit because the agency actually wanted to modify different services—called "point-to-point" services—the price for which was on file with the Federal Energy Regulatory Commission pursuant to the Federal Power Act.  *See id*.  The district court granted summary judgment for the

51

utility on the federal filed rate doctrine, but we vacated the judgment. We held that it was an open question whether "network service" was distinct from "point-to-point" service, and consequently whether the rates for "point-to-point" service were at issue. *See id.* at 617. If network services were "distinct" and there was no filed rate for that service, then "the doctrine would not confer immunity." *Id.* at 616. We therefore remanded for fact-finding as to whether there was a meaningful distinction between the services sought and the services for which FERC had approved a filed rate. *See id.* at 617.

In short, we confirmed in *Florida Municipal* that regulated sellers are not immune from litigation when the claim does not concern the entity's regulated services. *See id.* And we reinforced the common-sense notion that whether a filed rate applies to a given transaction is a precise factual inquiry, not a loose analysis to be done freehand.

In the absence of Pennsylvania or Florida precedent adopting some form of the filed rate doctrine, we do not know what these states would require for the lenders or ASIC to assert it as a defense. The scope of an affirmative defense is usually defined by the jurisdiction that established it. *See Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 629–30, n.3 (1988) (holding that federal courts "are not at liberty to depart" from state court decisions recognizing elements of an

affirmative defense or "to apply a different rule however desirable it may believe it to be"). *See also Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 992 (8th Cir. 2008) ("whether a contention is an affirmative defense is a question of state law") (citation and quotation marks omitted). But even if we assume that Pennsylvania and Florida have adopted the full version of the federal filed rate doctrine, the defendants have not met their burden to assert it as a defense.

Here, as in *Florida Municipal*, the defendants seek to invoke the filed rate doctrine without having established that a state filed rate actually governs the challenged transactions—e.g., the kickbacks the lenders received from ASIC. The record reveals that ASIC submitted some rate filings with the district court. *See Fowler* D.E. 91 at 12 (taking judicial notice of Rebecca H. Voyles Decl., D.E. 23-4); *Patel* D.E. 36 at 4 (taking judicial notice of various rate-schedule documents purportedly filed with state regulators, D.E.s 22-7, 22-13, and 22-15 through 22-18). But none of these documents mention the side agreements described in the homeowners' complaints.

Moreover, while it is theoretically possible that ASIC's rate filings included the "commissions" paid to the lenders, the record is devoid of any reference that such filed rates exist. SLS and ASIC argue at one point that state regulators approved the commission rates, *see Patel* Appellees' Br. at 10, but they cite no

53

facts or record evidence in support of this contention.  Their only authority is a Florida circuit court decision under the Florida Public Records Act that is at best tangentially related because it merely mentions ASIC's Florida rate filings.  *See Am. Sec. Ins. Co. v. Fla. Office of Ins. Reg.*, 2015 WL 10384359 (Fla. Cir. Ct. 2015).

Affirmative defenses are not established by silence, especially at the motion to dismiss stage.  We cannot and should not assume that the filed rate doctrine bars the homeowners' complaints without proof that such filed rates exist.

### D

Applying the federal filed rate doctrine here also conflicts with the goals that underpin it.  If the homeowners' claims are true, ASIC has discounted its customers' insurance costs through a kickback scheme, and has failed to charge the filed rates or treat the lenders equally with other customers in the market.

The filed rate doctrine avoids unreasonable price discrimination by "foreclosing the possibility that carriers maintain one rate on file while either negotiating another (secret) lower rate with some shippers or providing those shippers with illegal rebates or discounts." *In re Olympia Holding Corp.*, 88 F.3d 952, 956 (11th Cir. 1996).  In this way, the doctrine "protects smaller shippers from being undercut competitively." *Id.  See also Cent. Office Tel.*, 524 U.S. at

223 ("While the filed rate doctrine may seem harsh in some circumstances . . . its strict application is necessary to prevent carriers from intentionally misquoting rates to shippers as a means of offering them rebates or discounts, the very evil the filing requirement seeks to prevent.") (quotation marks and citation omitted).

This is why the Sixth and Third Circuits have concluded that the filed rate doctrine does not apply to challenges against agreements for which there are no filed rates. The Sixth Circuit, for example, allowed the plaintiffs' "challenge [because it] d[id] not concern the particular rate set by the [state regulator], but rather [involved] payments made outside of the rate scheme." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012). The filed rate doctrine did not apply because "'the side agreements at issue and the kickbacks paid pursuant to those agreements were not approved by, filed with, or even supervised by the [state regulator].'" *Id.* at 797. Likewise, in *Alston*, the plaintiffs argued that they were "challeng[ing] the payment of kickbacks, not the rates they paid for [private mortgage insurance]." 585 F.3d at 764. Because "those kickbacks [were] not, of course, filed with Pennsylvania," the plaintiffs asserted that "the [filed rate] doctrine d[id] not apply." *Id.* The Third Circuit agreed, explaining that the "plaintiffs d[id] not challenge directly the reasonableness or fairness of any rate set by the Commonwealth of Pennsylvania," but instead challenged a "captive

55

reinsurance arrangement constitut[ing] an alleged [illegal] kickback or fee-splitting scheme." *Id.* The plaintiffs' challenge concerned the defendant's "allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct." *Id*. at 765. *See also Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1099–1103 (W.D. Wash. 2007) (declining to extend the filed rate doctrine under Washington law to claims by homeowners that they obtained title insurance from insurers who paid illegal kickbacks and inducements).

The majority argues that *Alston* is inapposite because the claims there arose under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2607(d)(2). It makes sense, the majority says, that a federal statute like RESPA could circumscribe the filed rate doctrine. But that underscores the doctrine's federal nature. As a creature of federal common law derived from federal statutes, like the ICA in *Abilene Cotton*, Congress can displace the doctrine with legislation. *See City of Milwaukee et al. v. Illinois et al.*, 451 U.S. 304 (1981) ("[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of law-making by federal courts disappears."). Moreover, if the Third Circuit thought that RESPA preempted *Pennsylvania's* filed rate doctrine, it is curious that it did not discuss RESPA's preemptive scope. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)

56

(requiring the "clear and manifest purpose of Congress" for a federal statute to preempt state law). *Alston* concluded that the plaintiffs' kickback-scheme claims did not concern a filed rate, and thus it was "absolutely clear that the filed rate doctrine simply d[id] not apply." 585 F.3d at 765. Such a holding is not couched in the language of preemption.

The majority says that we should instead look to the Second Circuit's example in *Rothstein*. In that case, the Second Circuit faced similar claims against an insurer and its customers (lenders) for arranging a kickback scheme that charged homeowners for more than the actual cost of hazard insurance. *See Rothstein*, 794 F.3d at 259. The Second Circuit held that the "rebates," "kickbacks," and "free services,"—even though they were separate transactions from the ones between the insurer and lender for the hazard insurance—were still challenges against the insurance transaction itself. *See id.* at 259, 263. *Rothstein*, however, made two errors that we should not repeat.

First, the Second Circuit abdicated its duty to consider whether a challenged arrangement between an insurer and its customer is covered by a filed rate. It chose not to follow our precedent in *Florida Municipal* because, although the plaintiffs' claims concerned several separate transactions between separate parties, "there [wa]s a single (regulated) product." *Id.* at 264 n.5. But, as *Florida*

57

*Municipal* explained, a court must determine based on the facts of the case whether each transaction concerns a filed rate. *See* 64 F.3d at 617. And *Florida Municipal*, not *Rothstein*, constitutes binding precedent in this circuit.

Second, the Second Circuit doubled down on its error by claiming that once a regulator has "investigated" a similar complaint and "adopted a regulation restricting the practice," then "judicial endorsement of [the] [p]laintiffs' claims would displace and distort" the regulation of that practice. *Rothstein*, 794 F.3d at 263. But no controlling authority extends the filed rate doctrine to bar a lawsuit challenging transactions that regulators have disapproved, like the side transactions here. *See Fla. Mun.*, 64 F.3d at 616. Selling a regulated good or service at a discount from the filed rate is likewise forbidden by the filed rate doctrine, so suits to recover losses caused by such wrongful behavior are permitted. *See, e.g.*, *Sec. Servs. v. Kmart Corp.*, 511 U.S. 431, 440 (1994) (cited in *Florida Municipal*, 64 F.3d at 616); *Carnation Co. v. Pac. Westbound Conf.*, 383 U.S. 213, 216 (1966) (also cited in *Fla. Mun.*, 64 F.3d at 616).

As the majority correctly notes, the homeowners' claims in *Rothstein* were solely against the insurer (the lender had settled out of the case). *See* Maj. Op. at 27 n.8; *Rothstein*, 794 F.3d at 261. I concede that the homeowners' claims against the insurers, both here and in *Rothstein*, seem to be derivative of the claims against

58

the lenders.  Given that the homeowners are in privity of contract with only the lenders, the liability of an insurer would only arise from its participation in the lenders' wrongful overcharging of the homeowners under their mortgage contracts. I see no reason, however, why this dynamic should allow a rate-filer conducting unregulated transactions (or conducting regulated transactions at a rate other than the filed rate) to evade a lawsuit by invoking the filed rate doctrine.

Here, as in *Williams* and *Alston*, the challenges are to kickbacks or agreements other than the regulated transaction.  Barring the homeowners' claims effectively immunizes all entities in the insurance market, and allows insurers to engage in side schemes that reduce rates for preferred customers—in violation of the principle that created the filed rate doctrine in the first place.

### III

The majority's third and final misstep is the unwarranted extension of the filed rate doctrine to bar claims against the lenders as if they were regulated entities like ASIC.  Even assuming that the filed rate doctrine applies in Pennsylvania and Florida in its federal form, and assuming that the defendants have successfully shown that a governing rate has been filed with a state regulator, the filed rate doctrine precludes claims only against regulated sellers—not

59

downstream entities or resellers. The majority's holding, which sweeps in any entity that touches a regulated rate, is at odds with the federal filed rate doctrine.

Let us assume, as the lenders contend, that the homeowners complain merely that they are demanding reimbursement for insurance premiums that are unreasonably high. Even so, the homeowners' claims against the lenders should survive under the filed rate precedent that the majority cites. Why? Because the claims asserted are not against a regulated seller.

Pennsylvania and Florida regulate insurers through the Pennsylvania Insurance Commissioner and the Florida Office of Insurance Regulation. ASIC is the insurance company that filed rates for the relevant insurance product with these state agencies. None of the lenders did so, nor were they required to. The lenders simply bought the regulated insurance, supposedly at the filed rate, from ASIC. That transaction is the only sale regulated by the state agencies. Or, to look at it another way, none of the lenders have asserted that they filed a rate or that the relevant state agencies regulated their "resale" of insurance to the homeowners.

Allowing the homeowners' claims to go forward conforms with what have been called the "[t]wo rationales underl[ying] the [filed rate] doctrine"— "nonjusticiability" and "nondiscrimination." Maj. Op. at 14. Here's why.

60

The nonjusticiability principle decrees that courts should not be rate-setters, which happens when a plaintiff asks a court to remedy an unreasonably high rate. But that could not happen here. Some of the homeowners' claims are against the lenders, not the regulated seller (ASIC). So any remedy obtained against the lenders for these claims would not require the homeowners to pay a different price—a court could never order the regulated seller (ASIC) to sell the regulated product (hazard insurance) to lenders at a different price. Thus, the nonjusticiability principle is not implicated here. *See Hill*, 364 F.3d at 1317 (noting that the "purpose of the nonjusticiability principle . . . is to preserve the FCC's primary jurisdiction over determinations regarding the reasonableness of rates *charged by regulated carriers*") (emphasis added).

The same is true for the "nondiscrimination" principle, which forbids plaintiffs from suing to get lower rates than other customers. *See id.* at 1316. Critically, the homeowners here do not seek a lower insurance rate. Imagine, for instance, that the mortgage contract between the lenders and the homeowners did not tie the cost of the hazard insurance to the actual cost paid by the lenders. The lenders are not regulated by the state agencies governing insurance, so they are not required to pass along the exact same rate they paid the insurer. The lenders could have charged the homeowners a flat penalty above the cost of insurance for the

61

inconvenience of having to insure the homes, or the lenders could have waived any fee and absorbed the cost of the insurance themselves.  In either case, a breach of contract claim (like a claim that the insurer charged a penalty higher than the contract allowed) would not concern the rate initially paid by the lenders to the insurer.

Significantly, the homeowners' costs are contractually tied to what the lenders actually paid for insurance.  Although at first glance it might appear that the homeowners want to pay less for insurance than other customers on the market, in reality they only seek what their contract requires.  Their claims, if true, might reveal that their lenders paid less than any other customers in the market due to an unlawful kickback scheme, but that is immaterial to the alleged breach at issue. The majority's extension of the filed rate doctrine permits unregulated lenders to immunize themselves by structuring their contracts to follow the filed rate.[3]

In response, the majority reasons that "the filed-rate doctrine's applicability does not turn on whether *the plaintiff* is a *rate-payer*."  Maj. Op. at 15 (emphasis added).  Maybe so, but the majority never actually justifies expanding the filed rate

---

[3] As a policy matter, I am not sure that is a good idea.  *Cf. Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317–18 (11th Cir. 2004) (Edmondson, C.J., dissenting) ("I think today's court extends the judge-made filed-rate doctrine too far: Congress intended not to remove from the states the power to prevent deceptive trade practices . . . and [claims] for fraud and negligent misrepresentation.").

doctrine to bar a suit where *the defendant* is not a *rate filer*. It cites no Pennsylvania or Florida statute or regulation that governs regulated insurance products after ASIC sells it. Nor does it point to any court that has extended the filed rate doctrine to unregulated entities.

There are some decisions that have assumed or concluded that the filed rate doctrine could apply to a regulated buyer who resells a regulated product. Typically, however, the reason seems to be that no one contested the matter. *See, e.g.*, *Alston*, 585 F.3d at 764. The rare cases that address the issue come up empty-handed, as they can point to no reason to extend the doctrine to unregulated entities. *See, e.g.*, *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 419 (S.D.N.Y. 2009) (rejecting plaintiff's challenge to an unregulated defendant's invocation of a New York version of the filed rate doctrine for the dubious reason that the plaintiff "offers no authority . . . for the proposition that the filed rate doctrine cannot bar claims against entities not directly regulated by the rate-making authority"), *aff'd*, 379 F. App'x 30 (2d Cir. 2010).

The majority's hands are just as empty. The majority extends *Rothstein*—which, it admits, "dealt with claims against the insurer"—and argues that because the "underlying theory" is the same, *Rothstein* is persuasive. Maj. Op. at 27 n.8. It points to no case that justifies its expansive view of the filed rate doctrine.

63

If the majority seeks a model for how to address claims against unregulated sellers of regulated products, it should look no further than *Smith v. SBC Communications, Inc.*, 839 A.2d 850, 856–60 (N.J. 2004). In that case, the New Jersey Supreme Court analyzed the federal filed rate doctrine and concluded that telecommunication resellers generally could not invoke it. It held that the "[t]he independent resale of [regulated] services to a third party has no discriminatory effect" because everyone may "purchase the services under the same terms and with the same rates as those sold to a reseller." *Id.* at 859. "[D]amages resulting from a lawsuit involving the resale w[ould] not provide the victors with any type of discount" because "their claims arise out of a sales arrangement that exists completely independent of the original purchase agreement implicating the filed rate." *Id.* "To hold otherwise," the New Jersey Supreme Court concluded, would lead to the "nonsensical" outcome of a consumer "violat[ing] the FCA" by "purchas[ing] a calling card and then giv[ing] that card to a friend or relative free of charge." *Id.*

The analysis in *Smith* makes sense. The majority's contrary rule will allow unregulated entities to piggyback off the strict protections provided to regulated entities in exchange for their engagement with the regulatory scheme.

**V**

64

Whether some version of the filed rate doctrine applies in these cases is a matter of Pennsylvania and Florida law. We cannot assume, in the absence of state authority, that the filed rate doctrine applies in its federal form whenever an entity files rates with state agencies. Given the lack of state precedent on the issue, I would certify questions about the filed rate doctrine and its scope to the supreme courts of Pennsylvania and Florida.

Even if the federal filed rate doctrine exists in Pennsylvania and Florida, it does not and should not apply to unregulated transactions—like kickbacks—that do not involve a filed rate. And it should not be extended to lenders who do not file insurance rates with a state agency.

With respect, I dissent.

65